HARVEY, APPELLANT, *v.* HORN ET AL., APPELLEES.

(No. 86AP-224 — Decided
September 2, 1986.)

*Donald W. Conley,* for appellant.
*Lane, Alton & Horst* and *Theodore M. Munsell,* for appellees.

TYACK, J. On July 20, 1984, plaintiff-appellant, Keith Harvey, filed a complaint alleging a false arrest instigated by persons affiliated with the Royal Motor Inn in Columbus, Ohio. The complaint alleged that Harvey was a guest at the inn on November 12, 1983 when the desk manager purportedly instigated his arrest without a warrant and without cause. The acts of the defendant were alleged to have been "wilful and malicious." No criminal charges were actually filed.

On November 8, 1985, the complaint was amended for the sole purpose of adding an additional party. The substance of the complaint was not changed.

A jury trial on the action commenced on January 28, 1986. At the close of the plaintiff's case, the trial court granted a directed verdict for the defendants. Plaintiff-appellant then commenced this appeal, assigning the following error:

"The decision of the Court below is contrary to the evidence and the Court erred in not allowing the trial to proceed."

The assignment of error necessitates a thorough review of the evidence presented to the trial court, a construing of that evidence strongly in favor of the plaintiff-appellant, and then a comparison of the evidence with the facts which must be proved to demonstrate a false arrest.

The testimony at trial indicated that on October 30 or 31, 1983, Keith Harvey arrived in Columbus to attend a school on electronic switching. Harvey had been a communications technician with AT&T for eleven years. His employer had made arrangements for Harvey to be lodged at Royal Motor Inn on Olentangy River Road in Columbus and to be picked up by bus at the motel on the days that instructions took place. Likewise, a bus returned Harvey and his classmates to the Royal Motor Inn at the end of the instruction day.

As of November 12, 1983, Harvey had finished his second week of classes. As is natural in such situations, he had befriended some of his classmates and had made plans to go out socially with a few of them on that evening, which was a Saturday night. Harvey had spent most of the day in his room except for a brief shopping trip in the early afternoon.

Around 9:30 p.m., Harvey went to the pool room of the motel and then returned to his motel room to clean up or to finish cleaning up. He had on clothes suitable for going out and had put on a raincoat and scarf because the weather was cold. Harvey next went to the motel lobby to wait for his friends. He recognized the woman behind the desk, one Gladys Louise "Lou" Horn. He sat in the lobby for a while waiting, and then went up to the desk to get a pen and paper to write down the telephone number of the motel. He asked for and received the telephone number, wrote it down and put the note in his jacket pocket. He then sat down once again to await his friends.

After a while longer he got tired of waiting and left the motel, going to a bar in the complex across the parking lot. After staying in the bar five to ten minutes, he returned to the motel. As he was re-entering the motel a car drove up containing two of his friends, Paul Long and Cleve Mills. The friends

were supposed to have called around 9:00 p.m., but had not done so. Instead, they came to get Harvey. Paul Long went to his room to get some money and returned to the lobby, asking Keith Harvey to wait for him. Harvey re-entered the lobby to wait. He seated himself with his back toward the entrance. He soon heard a comment from another person in the lobby that the police were there. Appellant turned around and saw three or four police cruisers, but was not concerned since he knew he had done nothing wrong. He then heard a person in the lobby say, "I'm getting out of here because there must be a drug bust or something." People in the lobby started to leave, so appellant Harvey started to depart also, not wanting to get into a problem which otherwise did not involve him. Harvey recalls himself as being the last to leave.

Next, "a big cop" leveled a shotgun at Harvey and said, "Hey, you!" Harvey responded, "Who, me?" The "big cop" said, "Yeah, you * * * stop right there! Put your hands up!"

The officer then pushed Harvey up against the front glass of the motel and forced him to stand spread-eagle at gunpoint. Harvey tried to turn his head around and explain he was not the person the police were seeking. The officer responded, "Turn you head back around. I didn't ask you nothing."

Harvey was then searched while he stood with his hands up, legs spread and face against the glass of the motel lobby. He continued to try to explain that he was a patron of the motel, there for a training school. The large police officer said, "I didn't ask you anything. Just be quiet."

A total of about five police officers were present. The large officer had a shotgun. Two other officers had pistols drawn. During this time Harvey heard the motel manager telling the police about the number of times the motel had been robbed.

After being held two or three minutes, during which he continued to tell the police that he was a student and that they should go inside and find out, Harvey was released. The officers apologized. Eventually a representative of the motel apologized.

Apparently about 9:30 that evening the motel had in fact been robbed. After the robbery the regular desk clerks had been replaced on duty by the desk clerk manager, Gladys Louise "Lou" Horn, until the night auditor could take over and the situation could return to normal. Horn had not been present when the robbery occurred, but was summoned from home.

After Horn had been on duty for a brief period of time, she noticed the activity of Harvey as he waited in the lobby. Construing the evidence most favorably to plaintiff-appellant, she should have recognized Harvey. No evidence indicated that she did recognize him.

Horn, after observing Harvey's activities for a while, felt that his activities were suspicious and called police. The precise words she said to the police radio-room person who took the report were preserved on tape. They start:

"This is the Royal Motor Inn, 3232 Olentangy River Road, we were just robbed, and I think I have a suspicious guy here."

She then repeated the address and that the person was in the lobby.

As a result of this report, the police dispatcher put out a 10-41 call, which is a call indicating that a robbery has already occurred. A 10-42 call is the exact call for a robbery in progress, but according to police testimony the two calls are used somewhat interchangeably.

Sergeant Freddie Robinson and some of his precinct officers, upon hearing the dispatch, responded to the Royal Motor Inn. Sergeant Robinson was apparently the "big cop" with the

shotgun who restrained Harvey as he was leaving the motel and caused Harvey to be detained while he was searched for weapons. Upon an officer's obtaining Harvey's wallet and Harvey's status as a registered motel guest being verified, Harvey was released.

Harvey soon contacted counsel to start the process of filing a lawsuit against the Royal Motor Inn and persons affiliated, but not against any of the police personnel. With this factual background, the applicable tort law must be analyzed.

The essence of the tort of false arrest is the depriving of a person of his or her liberty without lawful justification. Specifically, a plaintiff must show only that he or she was detained and that the detention was unlawful. The tort does not require proof of malice, motive or lack of probable cause. See 45 Ohio Jurisprudence 3d (1983) 158, False Imprisonment and Malicious Prosecution, Section 5.

False arrest developed as a tort akin to trespass and criminal conversation, requiring no evil intent but merely an intrusion into a protected right. Since the tort was originally formulated, however, the rights of law enforcement personnel to detain a private citizen have changed significantly. Thus, in *Terry* v. *Ohio* (1968), 392 U.S. 1, 44 O.O. 2d 383, the Supreme Court of the United States sanctioned a limited detention of persons for investigative purposes where the law enforcement personnel had a reasonable suspicion that the person was about to engage in criminal conduct. This "stop and frisk" exception was expanded by the United States Supreme Court to allow limited detention where police suspected that a person was committing a crime at the moment of the stop. *Adams* v. *Williams* (1972), 407 U.S. 143. The right to detain without probable cause was extended further still in *United States* v. *Hensley* (1985), 469 U.S. 221, to include situations where the police officers involved did not themselves witness illegal or suspicious conduct, but detained an individual for a completed crime based upon a police radio broadcast. Justice Brennan, long the liberal and freedom-of-the-individual advocate of that court, wrote in concurrence in *Hensley,* at 236-237:

"I join the opinion of the Court. With respect to its effect on respondent's 'right * * * to be secure * * * in [his] perso[n]' guaranteed by the Fourth Amendment, the stop in this case — although it no doubt seriously infringed upon respondent's privacy — lasted a mere matter of moments, * * * before the discovery of the gun ripened what had been merely reasonable suspicion into the full-scale probable cause necessary for an arrest. For circumstances like these, *Terry* v. *Ohio,* 392 U.S. 1 (1968), 'defined a special category of Fourth Amendment "seizures" so substantially less intrusive than arrests that the general rule requiring probable cause to make Fourth Amendment "seizures" reasonable could be replaced by a balancing test.' *Dunway* v. *New York,* 442 U.S. 200, 210 (1979). * * * Such a balancing test is appropriate as long as it is conducted with full regard for the serious privacy interests implicated even by such a relatively nonintrusive stop. * * * Of course, in the case of intrusions properly classifiable as full-scale arrests for Fourth Amendment purposes, no such balancing test is needed. Such arrests are governed by the probable-cause standard provided by the test of the Fourth Amendment itself."

The Supreme Court of Ohio has not indicated a willingness or inclination to interpret police powers more narrowly than the standards mandated by the Constitution of the United States. Further, the Ohio Legislature has enacted an entire chapter of the Ohio Revised Code on the subject of ar-

rest and detention (R.C. Chapter 2935), but has not set forth specific guidelines for unlawful detention which are less intrusive than full-scale arrests in places other than mercantile establishments, libraries, museums and other archival institutions. Thus, apparently the guidelines for determining lawful and unlawful detentions come from the federal constitutional law set forth above.

Applying Fourth Amendment standards to Harvey's case, no unlawful detention occurred. The police communications division received a report which linked a recent robbery with a suspicious person at the Royal Motor Inn. The police dispatcher then aired a report indicating a completed robbery and a suspicious person at the inn. In response, several cruisers went to the Royal Motor Inn and the supervising sergeant, along with some of his officers, detained a man seen leaving the lobby. The man — Keith Harvey — was detained at gunpoint for two to three minutes while police investigated the situation. Harvey was then released without being arrested and he received an apology. Given the limited duration of the encounter, no matter how terrifying, and the information communicated to the street officer, the detention was not unlawful.

From a social policy point of view, having a unified standard for evaluating police conduct on the street makes good sense. Telling a police officer that he or she can detain a person lawfully for Fourth Amendment purposes and still be liable in a suit for false arrest would be to convey conflicting messages which can only make the difficult job of a police officer more difficult and confusing.

The fact that the detention here was lawful serves to protect the Royal Motor Inn and its employees from liability for false arrest. The suit does not present a negligence theory, a theory of malicious prosecution, or any other theories of liability. Therefore, once the determination has been made that no unlawful restraint occurred, a directed verdict was appropriate. The trial court did not err in granting the motion.

The assignment of error is overruled and the judgment of the trial court is affirmed.

*Judgment affirmed.*

REILLY and MARTIN, JJ., concur.

MARTIN, J., of the Fairfield County Court of Common Pleas, sitting by assignment in the Tenth Appellate District.