HUFF et al.

v.

OHIO DEPARTMENT OF ADMINISTRATIVE SERVICES et al.

Court of Claims of Ohio.

No. 93–16492.

Decided Oct. 4, 1995.

38

40

*Joseph I. Tripodi,* for plaintiffs.

*Betty D. Montgomery,* Attorney General, and *Susan M. Sullivan,* Assistant Attorney General, for defendants.

RUSSELL LEACH, Judge.

The court tried this matter on the sole issue of liability. Plaintiffs base their causes of action on theories of false imprisonment/false arrest and negligence.

Defendant Ohio State Highway Patrol ("OSHP") denies liability and asserts that its actions were at all times lawful. The court hereby renders the following opinion after thorough consideration of the evidence adduced at trial, the arguments of counsel, and the apposite law.

Plaintiffs' cause of action arose on February 18, 1993, as a result of a traffic stop and a subsequent search of their vehicle for narcotics. Plaintiffs James L. Huff et al. were traveling northbound on Interstate 77 ("I–77") in a white 1986 GMC Safari van at approximately 3:30 p.m. on the date in question. Trooper Dave Palmer, driving southbound on I–77, used K–55 radar to "clock" plaintiffs' speed at seventy-one miles per hour. The posted speed limit was sixty-five miles per hour. The weather conditions that afternoon were clear, windy and cold.

Trooper Palmer radioed the registered speed violation and the van's description to Trooper Victor Knick, who was located in the median crossover of the highway at milepost 8 and in a better position than Palmer in which to effectuate the traffic stop. Upon receipt of Trooper Palmer's radio message, Knick proceeded into northbound traffic and stopped plaintiffs' van in the right berm at milepost 15.

Trooper Thomas Holbert also responded to Trooper Palmer's radio message. Trooper Holbert's vehicle had been situated in the same median crossover as Knick's vehicle. They had both been located at the same site that day as part of a concentrated effort against drug trafficking in that area of I–77 by the Tactical Drug Interdiction Team ("TDIT") of the Ohio State Highway Patrol. Both Knick and Holbert were members of TDIT. Holbert arrived at the scene where plaintiffs' vehicle was stopped moments after Knick had arrived. They parked their cruisers in single-file fashion behind plaintiffs' van.

The effort by TDIT in that portion of I–77 was due, in part, to intelligence received earlier that day concerning possible narcotics trafficking in that area. The information came from a source operating in New Philadelphia, Ohio, and was passed through Sergeant Robert Bennington to other members of TDIT, including Knick and Holbert. Although the information was incomplete, it indicated that on February 18, 1993, drugs would be transported northbound on I–77 from Florida in a white van. A partial license plate number was also given to Bennington, who relayed the information to the troopers.

Plaintiffs' van fit the intelligence description of the possible drug trafficking vehicle. After the traffic stop, the patrol learned that plaintiffs were returning to New Philadelphia, Ohio, from Holiday, Florida. Originally, plaintiffs left New Philadelphia on Sunday afternoon, February 14, 1993, and drove to Holiday, Florida. They arrived on Monday, February 14, 1993, after a twenty-two-hour trip. Once there, they stayed at the residence of James Huff, the owner of the van. After a short fishing excursion on Wednesday, February 17, 1993, plaintiffs,

with the exception of Huff, departed from Florida at 9:00 p.m. that night to return to Ohio. They drove throughout the evening in shifts. At the time of the traffic stop on February 18, 1993, Don Bland was driving the van.

After the van had been stopped on the berm of I–77, Trooper Knick exited his cruiser and proceeded to the passenger window of the van. The route taken to the van by Knick was necessitated by the close proximity of the driver's side of the van to the moving right lane traffic on I–77. As Trooper Knick began taking information from the driver, Don Bland, a third trooper, Richard Meadows, arrived at the scene and parked his cruiser directly in front of plaintiffs' van.

Trooper Meadows was a specialized member of TDIT and a canine handler. The dog charged to Trooper Meadows was a highly trained narcotics detection dog named Fando, a two-year-old male German shepherd. As Knick stood at the passenger window of the van and asked the driver for necessary information, Meadows walked Fando around to allow the dog to conduct an exterior "sniff" of the van. Fando almost immediately alerted or indicated that there was the presence of narcotics by pawing and scratching the left rear quarter panel, the driver's door, and the right sliding door. The dog's reaction was a trained response to the presence of a narrow range of controlled substances.

Upon Fando's initial indication for narcotics, plaintiffs were removed and "patted down" by the officers. They were then placed in the rear of the cruisers parked at the scene. Once the plaintiffs were safely in the rear of the cruisers, Meadows directed Fando to perform a sniff of the inside of the van. Upon opening the sliding door of the van in order to put Fando inside, both Troopers Meadows and Knick detected the aroma of burnt marijuana. Once inside, Fando alerted the troopers to an upholstered recliner chair, a cooler, and a black suitcase.

During the interior sniff of the van, Sergeant Bennington, who had relayed the drug trafficking intelligence to the TDIT members, arrived at the scene and parked his cruiser behind Holbert's cruiser. Shortly thereafter, Lieutenant David Herman arrived at the scene and parked behind Bennington's vehicle. The lieutenant arrived at the same time as some of the van's contents were being removed and placed on the berm in order to make more room for Fando inside the van.

As the ranking officer at the scene, Lieutenant Herman's initial assessment was that the unfolding search scene was potentially dangerous to civilians and officers. There were four other troopers, four civilians, a dog, plaintiffs' van, and five patrol cruisers in close proximity to the rushing highway traffic. Additionally, the congestion at the scene was a potential distraction and, therefore, a hazard to the motoring public. For these reasons, Herman ordered the troopers to stop their search and repack any contents already removed from the van. He then

instructed the troopers to have the van towed to the Marietta Patrol Post, which is located eighteen miles away. The troopers were ordered to transport plaintiffs in the cruisers to the same location.

At approximately 5:30 p.m., Lieutenant Herman instructed the post by radio to inform the Washington County Prosecutor's Office of the situation. Jim Schneider, an assistant prosecutor who responded to the patrol's phone call, arrived at the Marietta Patrol Post almost simultaneously with the towed van.

Upon arrival, the van was placed in the post garage. Plaintiffs were provided coffee by Trooper Holbert. With Assistant County Prosecutor Schneider present in the garage, Trooper Meadows again walked Fando around the outside of the van. The dog alerted consistently to the same three external sources on the van as in the initial roadside "sniff."

At this point, the troopers began a thorough search of the van. The contents of the van were removed and placed on the garage floor. Panels on the rear doors of the van were removed in an effort to locate hidden compartments. The underside of the dashboard was visually inspected by an officer. Narcotics were never found.

After approximately four and one-half hours from the time of the initial traffic stop, plaintiffs were returned to their van. The contents of the van had been replaced and the rear door panels were reattached to the van. Don Bland was issued a warning ticket for the speed violation as he left the patrol post.

Plaintiffs allege two causes of action stemming from the Highway Patrol's stop and search. Plaintiffs have an action founded upon false imprisonment/false arrest and an ancillary action founded upon negligence. The court shall first address the latter action and then the former action.

Plaintiffs' negligence action is based upon the actual physical search of the van at the patrol post. They allege that the search damaged portions of the interior of the van which required repair. In a claim predicated on negligence, plaintiffs have the burden of proving by a preponderance of the evidence the existence of a duty, the breach of that duty, and injury resulting proximately therefrom. *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 21 O.O.3d 177, 423 N.E.2d 467. Plaintiffs claim that pieces of the van were removed, damaged, and replaced improperly.

After they were released from the Marietta Highway Patrol Post, plaintiffs testified that they noticed noises coming from the dashboard area and some problem with the headliner in the van. Plaintiff James Huff, who was the owner of the van, testified to multiple problems in his van which he attributed to the search by the officers. He was not present at the patrol post or in the van

immediately after the search. Huff presented the court with a bill for $991.15 dated August 23, 1993, over six months after the search.

The court finds that plaintiffs have failed to prove by a preponderance of the evidence that there is any actionable negligence for which defendant OSHP is liable. Accordingly, judgment is hereby rendered in favor of defendant OSHP and against plaintiffs on the issue of negligence.

■ Plaintiffs' cause of action based upon false imprisonment/false arrest requires more analysis. Plaintiffs claim that they were unlawfully imprisoned by defendant OSHP from the initial traffic stop until their release approximately four and one-half hours later.

■ Although used interchangeably by some courts, the difference between false arrest and false imprisonment is potentially relevant to the jurisdiction of this court. Pursuant to R.C. 2743.02(A)(1), the state consents to be sued for those causes of action as brought "between private parties." False imprisonment occurs when a person confines another intentionally, without lawful privilege and against his consent within a limited area for any appreciable time, however short. *Bennett v. Ohio Dept. of Rehab. & Corr.* (1991), 60 Ohio St.3d 107, 573 N.E.2d 633. The essence of the tort of false arrest is a deprivation of a person's liberty without lawful justification. *Harvey v. Horn* (1986), 33 Ohio App.3d 24, 514 N.E.2d 452. False arrest includes an intent by the authority with arrest powers to bring the detained person before the court, whereas false imprisonment is a matter between private parties. It follows that every false arrest has, at its core, a false imprisonment. Since no formal arrest occurred, and in conjunction with this court's limited jurisdiction, plaintiffs' cause of action shall be construed solely as an action for false imprisonment.

■ For purposes of the tort of false imprisonment, plaintiffs need only prove a detention of their person. The presumption then arises that the restraint was unlawful. This shifts the burden of proof to defendants to show legal justification. *Isaiah v. Great Atlantic & Pacific Tea Co.* (1959), 111 Ohio App. 537, 15 O.O.2d 291, 174 N.E.2d 128. The court is guided in the determination of the lawfulness of the detention by state and federal constitutional standards for seizure. *Harvey v. Horn,* 33 Ohio App.3d at 28, 514 N.E.2d at 455–456. The Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution grant the people the right to be secure in their persons from unreasonable seizures. Generally, the reasonableness of a seizure is measured by its legal nature and duration or scope.

■ Prior to the implication of a constitutional standard, plaintiffs must prove seizure. A person is seized when a law enforcement officer, by means of physical force or show of authority, has, in some way, restrained the person's

liberty such that a reasonable person would not feel free to walk away. *State v. Retherford* (1994), 93 Ohio App.3d 586, 639 N.E.2d 498. In the case at bar, plaintiffs were not formally arrested or physically forced into confinement at any time. Yet, the reasonable person faced with the accoutrements of the State Highway Patrol is subject to just such a show of authority.

A patrol cruiser with lights flashing initially required plaintiffs to pull off to the side of the road. As their vehicle was searched along I–77 with the troopers present, they were asked to sit in the rear of the patrol cruisers, albeit for their own warmth and safety. The reasonable person faced with these circumstances would not have felt free to leave, even if there had been someplace for them to go on a limited access highway like I–77. Nor would reasonable persons have felt free to leave the Marietta Highway Patrol Post when their van, in essence, had been impounded for the purpose of searching for narcotics. It is irrelevant to the issue of restraint that plaintiffs were free to walk within the post and were even provided coffee by the dispatcher. They were still confined to a limited area. The court finds that plaintiffs were seized in their person by the Ohio State Highway Patrol on February 18, 1993.

██ Once a seizure or detention is established by plaintiffs, defendant OSHP must prove the lawfulness of that detention or be held liable. Because of the continuing nature of the false imprisonment tort, a person who intentionally confines another over a period of time cannot avoid liability on the basis that the initial confinement was privileged. *Bennett v. Ohio Dept. of Rehab. & Corr.*, 60 Ohio St.3d at 109, 573 N.E.2d at 636. The court's determination of the lawfulness of the seizure is best analyzed over four distinct phases of the detention: the initial traffic stop; the roadside searches; the transport to the Marietta Patrol Post; and the search at the Marietta Highway Patrol Post.

██ Plaintiffs claim that their initial confinement was unlawful because Trooper Knick exercised a pretextual traffic stop. The nature of the pretextual traffic stop is one in which a police officer uses a minor traffic violation in order to stop a vehicle for investigation into a more serious, unrelated crime, such as illegal drug activity. *United States v. Guzman* (C.A. 10, 1988), 864 F.2d 1512. The propriety of a traffic stop is to be reviewed by the standard of reasonable suspicion based upon specific and articulable facts. *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. Trooper Knick stopped plaintiffs' van for a speeding violation, R.C. 4511.21. Knick's basis for the stop was Trooper Palmer's radar reading of seventy-one miles per hour in a sixty-five-miles-per-hour zone. The court finds that Trooper Knick had at least reasonable suspicion supported by reasonable and articulable facts that plaintiffs' had violated a motor vehicle statute.

The court has no doubt that the drug trafficking intelligence played some role in the traffic stop being effectuated by TDIT members Knick and Holbert. The court could even postulate that the intelligence influenced Palmer to "clock" the van's speed. Regardless, the underlying intention or motivation of an officer does not invalidate an otherwise legally authorized stop. *United States v. Cummins* (C.A.8, 1990), 920 F.2d 498. The court finds that Trooper Knick's traffic stop was legally authorized and not pretextual in nature.

A legal detention does not alone make a detention lawful under the constitutional standard, nor ultimately the false imprisonment tort. The scope or duration of an investigative detention may last no longer than is necessary to effectuate the purpose of the stop. *Florida v. Royer* (1983), 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229. Trooper Knick's purpose in making the traffic stop was the issuance of a citation. In determining the reasonableness of the traffic-stop duration, the court must evaluate the diligence of the officer under the totality of the circumstances. *State v. Cook* (1992), 65 Ohio St.3d 516, 605 N.E.2d 70. Trooper Knick had only begun the preliminary questioning of the driver, Don Bland, when the legal nature of plaintiffs' detention changed from that of a routine traffic stop. The court finds that the abbreviated duration of the traffic stop was reasonable in length. Plaintiffs' detention during the traffic stop was lawful.

The duration of the traffic stop was brief because of the positive dog sniff for narcotics. When the nature of an otherwise legal detention changes, the government must show that the continued restraint of the person is warranted by an independent, reasonable, or articulable suspicion that further criminal activity is afoot. *State v. Retherford,* 93 Ohio App.3d at 601, 639 N.E.2d at 508–509.

The nature of the detention of plaintiffs did not change simply because Trooper Meadows conducted a dog sniff of the exterior of the van. Where a vehicle is lawfully detained, an officer does not need reasonable suspicion of drug-related activity in order to conduct a dog sniff of the exterior of the vehicle. *State v. Carlson* (1995), 102 Ohio App.3d 585, 657 N.E.2d 591. See, also, *State v. Palicki* (1994), 97 Ohio App.3d 175, 646 N.E.2d 494. The reasoning behind this is that an exterior canine sniff does not constitute a search within the meaning of the Fourth Amendment. *United States v. Place* (1983), 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110. Trooper Meadows conducted the first canine sniff around the perimeter of the van concurrently with, and coincident to, the lawful traffic stop.

Rather, the nature of the detention changed when Trooper Knick ceased the traffic stop inquiry after the dog indicated that narcotics were present in the van. Plaintiffs were placed in the rear of the patrol cruisers. Once a

trained dog alerts to the odor of drugs from a lawfully detained vehicle, an officer has probable cause to search the vehicle for contraband. *United States v. Ludwig* (C.A. 10, 1993), 10 F.3d 1523. Probable cause means that there is a fair probability that contraband or evidence of a crime will be found in a particular place. *Illinois v. Gates* (1983), 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527. Reasonable suspicion based upon reasonable, articulable facts, which requires a lesser quantum of information than probable cause, is the minimum standard that defendant must meet for a legal detention.

Although the troopers possessed probable cause to search, they did not automatically possess probable cause to seize plaintiffs. The privacy interest intruded upon by a search of a vehicle is less than that in someone's person. The troopers had a positive drug sniff of the exterior, interior, and some contents of the van. In addition, two of the troopers smelled burnt marijuana. Furthermore, the description of the van and plaintiffs' itinerary matched the drug-trafficking intelligence provided to the troopers. The court finds that the troopers possessed at least reasonable suspicion of criminal narcotics activity independent of the traffic violation. The nature of the detention remained legal.

██ While plaintiffs were legally detained in the back of the patrol cruisers, the troopers started to conduct a thorough search of the van. The reasonableness of the duration of a legal detention is determined by the court under the totality of the circumstances. *State v. Cook,* 65 Ohio St.3d at 521–522, 605 N.E.2d at 78–79. The troopers on the scene were faced with difficult and hazardous conditions under which to conduct a search of the van for narcotics. The weather conditions were cold and windy. The light was waning in the late afternoon. The area in which to search the contents of the van was limited to the guardrail-bordered berm. The number of troopers, civilians, and vehicles created a crowded and hazardous search site in close proximity to the rushing northbound traffic on I–77. The court finds that the duration over which plaintiffs were detained in the back of the roadside cruisers was reasonable under the circumstances. This, coupled with the legal nature, made the continued detention lawful.

██ The duration of plaintiffs' detention was substantially increased by moving the scene of the search to the Marietta Highway Patrol Post. The purpose of the Fourth Amendment is to impose a standard of reasonableness upon the exercise of discretion by law enforcement officers in order to safeguard the privacy and security of individuals against arbitrary governmental invasions. *State v. Carlson* (1995), 102 Ohio App.3d 585, 657 N.E.2d 591. Herman's order to halt the roadside search was based on the same factors that made the search so difficult: the weather conditions and highway hazard to both civilians and the

troopers. In addition, the scene itself, with all the cruisers and troopers, constituted a hazard to the motoring public on I–77.

The court is cognizant of the greater degree of intrusion upon plaintiffs' liberty of movement that this move caused plaintiffs, but this must be tempered by the important and legitimate state interest to fight the flow of narcotics across its borders. The court finds that Lieutenant Herman's decision was supported by at least reasonable and articulable suspicion of narcotics trafficking. Furthermore, the greater intrusion upon plaintiffs' rights was not unreasonable or arbitrary, given the weather conditions and safety concerns. Because the impetus behind the transport of plaintiffs was based upon reasonable suspicion of criminal activity and lasted only for a short period of time, their continued detention from the roadside scene to the Marietta Highway Patrol Post was lawful.

█ Once plaintiffs' van arrived at the patrol post behind a tow truck, the search did not immediately begin anew. The continued detention of a vehicle and the passengers may be only for as long as the officer continues to have a reasonable suspicion that there has been a violation of the law. *State v. Chatton* (1984), 11 Ohio St.3d 59, 11 OBR 250, 463 N.E.2d 1237. With the van out of the elements, and away from the rushing traffic, Trooper Meadows performed a third dog sniff of the van. Fando again consistently alerted to the same spots on the van as the prior sniffs. The court finds that the troopers possessed a sufficient quantum of information necessary for at least a reasonable suspicion in order for the continued detention of plaintiffs to remain lawful. Furthermore, the court finds that the troopers diligently carried forth the search for drugs in light of the size of the vehicle and the sophistication of drug traffickers in the concealment of transported narcotics. Plaintiffs were held at the post for a period of time consistent with a thorough search. Plaintiffs' detention at the Marietta Highway Patrol Post remained lawful.

For the reasons stated herein above, the court finds that defendant OSHP has proven by a preponderance of the evidence that plaintiffs' four-and-one-half-hour detention was lawful for purposes of the false imprisonment action. Accordingly, judgment is hereby rendered for defendant OSHP and against plaintiffs.

*Judgment for defendant.*