[Cite as *Wilhelm v. Ohio Dept. of Natural Resources*, 2009-Ohio-7061.]

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

RANDY WILHELM

    Plaintiff

    v.

OHIO DEPARTMENT OF NATURAL RESOURCES

    Defendant

Case No. 2006-07902

Judge Joseph T. Clark
Magistrate Anderson M. Renick

MAGISTRATE DECISION

{¶ 1}  Pursuant to Civ.R. 53, this case was assigned to Magistrate Anderson M. Renick to conduct all proceedings necessary for decision in this matter.

{¶ 2}  Plaintiff brought this action alleging assault, battery, false arrest, selective enforcement, intimidation, and intentional infliction of emotional distress.[1]  The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

{¶ 3}  Plaintiff's claims arise out of an incident that occurred on December 7, 2002, while he was hunting on his family's property with his father, Alva Wilhelm, his brother, Bradley Wilhelm, his fiancée, Machael Hartsook, and two family friends, Brian and Jerry Hoeflich.  After hunting for several hours, plaintiff and Alva emerged from a wooded area and began to walk across a field toward Paige Road which borders the Wilhelm property in Knox County, Ohio.  Wildlife Officers Michael Miller and William Runnels were assigned to a surveillance operation that defendant was conducting when they observed the hunting party while traveling on Paige Road.  Miller and Runnels decided to approach the Wilhelms to verify that they were hunting legally.

{¶ 4}  Miller testified that he recognized plaintiff from a previous encounter with another hunting party.  Miller stated that the officers decided to approach the Wilhelms with caution because they were armed with shotguns and had a reputation for violence.  Miller was also aware that Bradley Wilhelm was under indictment for a criminal offense and could not lawfully possess a weapon.  Before exiting his patrol vehicle, Miller contacted the Knox County Sheriff's office and requested assistance.

{¶ 5} While Miller remained on the radio in the patrol vehicle, Runnels approached the Wilhelms and inspected their shotguns for compliance with hunting regulations.   Runnels testified that he was aware of the Wilhelms' "tendency for

---

[1]On March 15, 2007, the court dismissed plaintiff's claims for attempted murder and violations of his constitutional rights.

violence." After completing his inspection, Runnels placed the unloaded weapons on the ground and, prior to conducting a pat-down search, he asked the Wilhelms whether they possessed radios. Plaintiff denied having a radio. During Runnels interaction with the Wilhelms, the Hoeflichs, who appeared to be unarmed, stood nearby. Runnels estimated that Bradley Wilhelm and Machael Hartsook stood approximately 100 yards away in the adjacent field when Miller exited the patrol vehicle and approached plaintiff.

{¶ 6} Miller asked plaintiff to confirm that his brother, Bradley, was one of the hunters who remained in the field. When plaintiff acknowledged that Bradley was in the field, Miller informed plaintiff that Bradley could not lawfully possess a firearm and he yelled to Bradley to come down to the road. According to Miller, plaintiff began to wave his arms and motion for Bradley to stay back. Miller also noticed that plaintiff was holding a small tape recorder. Miller ordered plaintiff to stop signaling Bradley, and Miller threatened to arrest plaintiff if he continued to interfere by moving his hands. Plaintiff denied that he was interfering and he stated that he was trying to assist in "bringing [Bradley] down." When plaintiff again motioned with his hands, Miller drew his weapon and ordered everyone in the hunting party to put down their shotguns. Runnels also drew his weapon and Miller called the sheriff's office to expedite the request for assistance.

{¶ 7} Plaintiff became argumentative and Miller placed him under arrest. When plaintiff refused to comply with Miller's orders, Miller holstered his weapon and threatened to use pepper spray to gain compliance. Although plaintiff continued to be argumentative, Miller was eventually able to place plaintiff on the ground and handcuff him. Miller continued to order Bradley to place his shotgun on the ground and walk toward the road. When Bradley approached the road, Miller jumped across a drainage ditch and placed him in handcuffs. After returning to the road with Bradley, Miller attempted to move plaintiff to the patrol vehicle; however, plaintiff resisted Miller's commands to stand and walk toward the vehicle. Miller testified that he had to assist plaintiff to stand after plaintiff twice refused to do so and that he had to push plaintiff in

the back to compel him to walk to the vehicle. Plaintiff was then directed to sit against the patrol vehicle such that his legs extended onto Paige Road.

{¶ 8} Knox County Patrol Officer Tom Durbin responded to Miller's call for assistance and, upon arrival, he left the emergency lights on when he parked his patrol car several car lengths behind defendant's patrol vehicle where plaintiff remained sitting. Durbin observed Miller pick up the tape recorder and tell plaintiff that it would be held as evidence. Before plaintiff was placed in Durbin's patrol vehicle to be transported to jail, Durbin removed rifle ammunition and other shells from plaintiff's pockets. Thereafter, Durbin discovered a two-way radio under the seat of the vehicle. When plaintiff was questioned about the radio, he denied that he had possessed it.

{¶ 9} As a result of the incident, plaintiff was charged with interfering with an officer, carrying an illegal radio, and possessing illegal ammunition. Plaintiff ultimately pleaded guilty to possession of illegal ammunition.

**UNLAWFUL DETENTION/FALSE IMPRISONMENT**

{¶ 10} Plaintiff asserts that the charges against him were not specified at the time of his arrest and that his detention by defendant was unlawful. Defendant contends that plaintiff's claim for "unlawful detention" should be construed as a claim for false imprisonment and therefore barred by the applicable statute of limitations.

{¶ 11} Plaintiff's claim for "unlawful detention" or false arrest is essentially a claim for false imprisonment. The Tenth District Court of Appeals has held that "[t]he essence of the tort of false arrest is the depriving of a person of his or her liberty without lawful justification. Specifically, a plaintiff must show only that he or she was detained and that the detention was unlawful." *Harvey v. Horn* (1986), 33 Ohio App. 3d 24, 27. "A claim for false arrest is treated as a claim for false imprisonment because the essences of the two actions are indistinguishable." *McDonald v. Ohio State Parole*, Ct. of Cl. No. 2007-

05113, 2007-Ohio-7238, ¶9 citing *Ashcroft v. Mt. Sinai Medical Center* (1990), 68 Ohio App.3d 359, 364.

{¶ 12} R.C. 2743.16(A) provides in relevant part:

{¶ 13} "[C]ivil actions against the state permitted by sections 2743.01 to 2743.20 of the Revised Code shall be commenced no later than two years after the date of the accrual of the cause of action *or within any shorter period that is applicable to similar suits between private parties.*"  (Emphasis added.)

{¶ 14} R.C. 2305.11(A) requires that an action for false imprisonment be brought within one year after the cause of action accrues.  See *Mickey v. Ohio Dept. of Rehab. & Corr.*, Franklin App. No. 02AP-539, 2003-Ohio-90; *Haddad v. Dept. of Rehab. & Corr.*, Franklin App. No. 01AP-1130, 2002-Ohio-2813.  As a general rule, a claim for false imprisonment accrues upon plaintiff's release from confinement.  *McAllister v. Ohio Dept. of Rehab. & Corr.*, Ct. of Cl. No. 2003-04449, 2004-Ohio-3823; see also *Haddad*, supra.

{¶ 15} Plaintiff asserts that he filed an action against Miller in federal court on September 2, 2003, (Defendant's Exhibit D) and that his original filing in this court was timely under the savings provision in R.C. 2305.19(A).  However, defendant was not a party in the federal action.

{¶ 16} The Supreme Court of Ohio has held that, "in order for the savings statute to apply, the original suit and the new action must be substantially the same, noting that, '[t]he actions are not substantially the same, however, when the parties in the original action and those in the new action are different.'"  *Heilprin v. Ohio State University Hospitals* (1986), 31 Ohio App.3d 35, 37 quoting *Children's Hospital v. Dept. of Public Welfare* (1982), 69 Ohio St.2d 523, 525.

{¶ 17} Inasmuch as plaintiff's federal action was based upon an event that occurred several months before the incident at issue in this case and, in light of the fact that defendant was not named as a party in the federal case, the savings statute cannot be applied in this case.

{¶ 18} Plaintiff's claim for false imprisonment accrued, at the latest, upon his release from defendant's custody in December 2002. However, plaintiff did not file his original complaint in Case No. 2004-10604 until December 2, 2004. After voluntarily dismissing Case No. 2004-10604 on January 17, 2006, plaintiff filed his complaint in this case on December 21, 2006. Therefore, plaintiff's claim for false imprisonment is barred by the one-year statute of limitations.

{¶ 19} Moreover, plaintiff admits in his complaint that he pleaded guilty to the ammunition charge and that he received a sentence of 30-days incarceration with 25 days of the sentence suspended. (Complaint, ¶70.) "A guilty finding in a criminal proceeding, whether by trial or plea, constitutes an absolute defense to an action for false arrest or false imprisonment." *Espy v. Sears, Roebuck & Co.* (Mar. 18, 1976), Franklin App. No. 75AP-551.

## ASSAULT/BATTERY

{¶ 20} Former R.C. 2305.111 provides, in relevant part:

{¶ 21} "[A]n action for assault or battery shall be brought within one year after the cause of the action accrues."

{¶ 22} Plaintiff's claims for assault or battery accrued on December 7, 2004. Plaintiff filed his complaint on December 21, 2006. Therefore, plaintiff's claims for assault and battery are time-barred.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

{¶ 23} Plaintiff alleges that he suffered emotional distress as a result of Miller's conduct. However, a claim for intentional infliction of emotional distress cannot be asserted to circumvent the statute of limitations when the essential character of plaintiff's allegations involve intentional acts of assault and battery. *Doe v. First United*

*Methodist Church,* 68 Ohio St.3d 531,536, 1994-Ohio-531; *Johnson v. Cox*, (Mar. 28, 1997), Adams App. No. 96CA622.

{¶ 24} The court finds that the true nature of plaintiff's claim for intentional infliction of emotional distress is an alleged assault and battery and, therefore, the claim is barred by the statute of limitations.

**INTIMIDATION, COERCION AND UNLAWFUL MANIPULATION**

{¶ 25} In Count 7 of his complaint, plaintiff asserts that the actions of defendant's employees caused plaintiff to be "intimidated, coerced and unlawfully manipulated while enduring wetness and cold, and causing plaintiff substantial discomfort and mental torment."

{¶ 26} The court finds that the claim asserted in Count 7 merely restates plaintiff's claims for false imprisonment, assault, battery, and intentional infliction of emotional distress. Accordingly, plaintiff cannot prevail on such claims.

**SELECTIVE ENFORCEMENT**

{¶ 27} In Count 5 of his complaint, plaintiff asserts that Miller demonstrated "unlawful bias" regarding the enforcement of Ohio's hunting laws such that defendant is liable for "selective enforcement." R.C. 1533.17(A) prohibits anyone from hunting on private property without obtaining written permission from the owner or the owner's authorized agent. Plaintiff asserts that, on December 6, 2002, Miller unlawfully failed to charge three hunters with violating R.C. 1533.17(A) when Miller was allegedly presented with evidence that they had hunted on plaintiff's property without his permission.

{¶ 28} In the context of a civil action, selective enforcement involves unconstitutional discrimination resulting from intentional prosecution of a defendant. See *Zageris v. Whitehall* (1991), 72 Ohio App.3d 178, 186-187.

{¶ 29} The court notes that plaintiff has presented no authority to support his assertion that the court has jurisdiction to hear his claim of selective enforcement. To the extent that plaintiff alleges that his constitutional rights were violated, it is well-settled that such claims are not actionable in the Court of Claims. See *Thompson v. Southern State Community College* (June 15, 1989), Franklin App. No. 89AP-114; *Burkey v. Southern Ohio Corr. Facility* (1988), 38 Ohio App.3d 170. Moreover, inasmuch as plaintiff was not charged with violating R.C. 1533.17(A), plaintiff lacks standing to assert his selective enforcement claim.

## NEGLIGENT RETENTION AND SUPERVISION

{¶ 30} Plaintiff has alleged that, prior to the incident at issue, defendant's employees had used excessive force against both him and his family. Based upon the allegations stated in the complaint, the court construes plaintiff's complaint to include a claim for negligent retention and supervision.

{¶ 31} The elements of a negligent retention claim are the same as those for negligent supervision. *Browning* v. *Ohio State Highway Patrol*, 151 Ohio App.3d 798, 811, 2003-Ohio-1108, citing *Harmon v. GZK, Inc.*, Montgomery App. No. 18672, 2002-Ohio-545. The factors needed to establish a claim for negligent retention and supervision are: 1) the existence of an employment relationship; 2) the employee's incompetence; 3) the employer's actual or constructive knowledge of such incompetence; 4) the employer's act or omission causing plaintiff's injuries; and, 5) the employer's negligence in hiring or retaining the employee as the proximate cause of plaintiff's injuries. *Peterson v. Buckeye Steel Casings* (1999), 133 Ohio App.3d 715, 729, citing *Evans v. Ohio State Univ.* (1996), 112 Ohio App.3d 724, 739; *Payton v. Receivables Outsourcing, Inc.*, 163 Ohio App.3d 722, 2005-Ohio-4978. Liability for negligent retention arises where an "employer chooses to employ an individual who 'had a past history of criminal, tortious, or otherwise dangerous conduct about which the

[employer] knew or could have discovered through reasonable investigation.'" *Abrams v. Worthington*, 169 Ohio App.3d 94, 2006-Ohio-5516, ¶14 quoting *Byrd v. Faber* (1991), 57 Ohio St.3d 56, 61.

{¶ 32} Applying the above-referenced elements, the court notes that it is undisputed that there was an employment relationship between Miller and defendant. However, plaintiff failed to establish any of the other elements. Specifically, plaintiff has failed to show that Miller was incompetent. Moreover, the testimony as to Miller's conduct during the incident was conflicting.

{¶ 33} Specifically, the parties' versions of the incident diverge at the point when Miller made his decision to apprehend Bradley Wilhelm. Plaintiff testified emphatically that he did not interfere with Bradley's arrest and he denied that he had waved his arms as a signal for Bradley to leave the scene. According to plaintiff, Miller "went nuts" when he observed plaintiff holding a tape recorder and, on two occasions, Miller pointed his service weapon at plaintiff's head while yelling to Bradley that he was "going to shoot [plaintiff]" if Bradley refused to walk to the road. Plaintiff testified that he feared for his life and that Miller used excessive force by placing his full weight on plaintiff's back and by pulling plaintiff's hair while placing him under arrest. Plaintiff further testified that Miller dragged him across the road and forced him to sit on the road in such a manner that plaintiff was in danger of being struck by passing vehicles.

{¶ 34} Defendant asserts that plaintiff's version of the events is inconsistent with the tape recording and that the recording shows that Miller and Runnels did not breach any duty owed to plaintiff.

{¶ 35} Plaintiff asserts that the audio tape recording that was presented at trial was not a true and accurate recording of the incident. Specifically, plaintiff alleges that the cassette tape (Joint Exhibit 1) is not the original tape that was seized as evidence at the time of plaintiff's arrest and that the audio recording on the tape had been intentionally edited or altered by defendant's employees. According to plaintiff, Joint Exhibit 1 differs from the tape that he used to record the incident in both the brand and

the color of the tape. Plaintiff further testified that Alva recorded the serial number of the tape on an index card before plaintiff left to go hunting and that Joint Exhibit 1 does not bear that serial number.

{¶ 36} Megan Timlin, a forensic audio visual analyst employed by the Ohio Organized Crime Investigations Commission, testified regarding the tests and procedures she utilized in analyzing the tape recording. Timlin testified that she visually inspected the tape and she detected nothing to indicate that it had been cut, spliced, or otherwise altered from its original condition. Timlin also analyzed the "waveform" of the recording, a graphic representation of the audio, to detect any "dropouts" or background noise representing either an abrupt start or stop which would be consistent with an attempt to edit the recording. As a result of her analysis, Timlin concluded that the tape was authentic and that there was no evidence to suggest that the tape had been either tampered with or edited.

{¶ 37} Although plaintiff asserts that tests could have been performed to determine whether the tape recording was authentic and unedited, plaintiff failed to have such a test performed. Rather, plaintiff attempted to discredit Timlin's opinion that the tape was unedited through the testimony of his own audio expert on rebuttal.

{¶ 38} Stephen Cain, plaintiff's audio expert who is the president of a private forensics lab, testified that there were "deficiencies" in Timlin's analysis and that she was not familiar with certain protocols for authenticating audio recordings "that have been internationally published for the Audio Engineering Society." Cain was also critical of Timlin's failure to use both spectrographic analysis and spectral analysis during her evaluation of the tape. According to Cain, such an analysis could have provided a definitive answer as to whether the tape was an authentic and unedited recording.

{¶ 39} The court finds Timlin's testimony regarding the authenticity of the tape to be persuasive. In addition, the court finds plaintiff's self-serving testimony that Joint Exhibit 1 is not the tape that he used to record the incident is not credible. The court

notes that plaintiff did not seek to have the tape analyzed by an expert until after the deadlines for discovery and identifying experts had passed.[2]  Furthermore, plaintiff testified that the document which was used to record the serial number of the tape had been in his possession since the day of the incident; however, he did not produce that document prior to trial.

{¶ 40} Miller and Runnels testified that both the tape recording and transcription of the recording were true and accurate representations of the incident.  Although plaintiff contends that the statements that can be heard in the tape recording were "out of sequence" and that there are "pieces missing" from the recording, on cross examination plaintiff admitted that many portions of the recording were accurate.  Furthermore, plaintiff did not identify which specific portions of the recording he believes to have been altered.  Based upon the testimony and evidence, the court concludes that the tape recording is an accurate representation of the events at issue and that any unintelligible portions of the recording are not so substantial as to render the recording, as a whole, untrustworthy.

**PLAINTIFF'S CREDIBILITY**

{¶ 41} Plaintiff's credibility regarding his version of the incident was undermined by his own testimony which was inconsistent with both the tape-recorded evidence and the testimony of the other witnesses.  The evidence showed that Miller was cautious when he approached the hunting party and that plaintiff became uncooperative when Miller asked Bradley to walk towards the road.  Both plaintiff and Miller testified that they recalled the following conversation:

{¶ 42} "MILLER:    Is that Brad?

{¶ 43} "RANDY:    Yeah.

---

[2]On May 12, 2008, the court denied plaintiff's motion seeking the return of the tape so that it could be examined by an expert beyond the court's deadline for identifying experts.  Plaintiff testified that he had listened to the tape recording in January 2008, prior to being deposed by defendant.

{¶ 44} "MILLER:   Will you tell him to get down here?

{¶ 45} "RANDY:   What do you need him for?

{¶ 46} "MILLER:   Because he's not allowed to possess a firearm.

{¶ 47} "RANDY:   Well, he's been talking to a lawyer and -- (unintelligible) a lawyer (unintelligible).

{¶ 48} "MILLER:   No, under indictment, you can't.  You guys discuss that with the attorney.

{¶ 49} "That's Brad; right?

{¶ 50} "Brad, get down here.  Now.

{¶ 51} "If you tell him to leave, I'm going to arrest you.

{¶ 52} "RANDY:   I'm not telling anybody nothing.

{¶ 53} "MILLER:   Don't move your hands.  Don't do nothing.

{¶ 54} "RANDY:   I'm not telling nobody nothing.

{¶ 55} "MILLER:   That's fine.  I don't care if you're taping.  But if you move your hands again, waving him away, I'm going to arrest you.  And you can tell your attorney that.

{¶ 56} "RANDY:   I'm bringing him down."  (Defendant's Exhibit C, Page 2, Line 6 -Page 3, Line 6.)

{¶ 57} Although plaintiff testified that he did not wave his arms, or otherwise signal his brother, plaintiff admitted that Miller directed him not to move his hands.  The testimony of the members of plaintiff's hunting party that plaintiff did not move his hands to signal his brother is not credible in light of the recorded conversation between Miller and plaintiff wherein plaintiff explains that he is "bringing [Bradley] down" in response to Miller's order to stop moving his hands.

{¶ 58} The recording also contradicted the testimony of the other members of the hunting party.  Although the Wilhelms and the Hoeflichs all testified that Miller and

Runnels refused to explain why plaintiff and Bradley had been placed under arrest, the recording shows that both Miller and Runnels stated the reasons for the arrests.

{¶ 59} "MILLER:    You're under arrest.

{¶ 60} "RANDY:    What'd I do?

{¶ 61} "MILLER:    You're under arrest for deterring –

{¶ 62} "RANDY:    I'm just sittin' here.

{¶ 63} "MILLER:    I give you an order, and you're not listening to what I'm saying. (Defendant's Exhibit C, page 5, lines 13-19.)

{¶ 64} "* * *

{¶ 65} "BRAD:    Dad – Dad, why am I under arrest?

{¶ 66} "ALVA:    I don't know, Brad.

{¶ 67} BRAD:    "Dad –

{¶ 68} "RUNNELS:    I don't make – I imagine it would be because you guys – when an officer tells you to do something –

{¶ 69} "ALVA:    Yeah.

{¶ 70} "RUNNELS:    "-- you've go to do it.  Okay, that's a lawful order to have you come down.  If you don't come down – if you guys don't sit down, when we ask you to sit down, that's officer safety.  You guys aren't doing those things, and there's going to be – you're going to move up the scale.  Okay?  So that's all you've go to do. You guys don't listen to what we tell you, then we're going to move up.  That's why you guys are in custody.  They're not listening – reacting to what the officers tell them to do." (Defendant's Exhibit C, Page 13, Line 7 - Page 14, Line 2.)

{¶ 71} Furthermore, Jerry Hoeflich testified that plaintiff was not argumentative and neither swore at Miller nor threatened his job; however, during cross-examination, plaintiff contradicted Hoeflich's testimony when he admitted that the recording showed he had made such statements.

{¶ 72} The court finds that the tape recording represents a logical progression of the events that led to plaintiff's arrest and that the recording is consistent with Miller's

version of the incident. Furthermore, Miller's testimony was corroborated by the testimony of both Runnels and Durbin. Although plaintiff testified that Miller tried to kick snow on the tape recorder after plaintiff was in custody, Miller, Durbin, and Runnels each testified that there was no appreciable snow on the ground. Durbin also testified that plaintiff denied that he had placed a two-way radio under the seat of Durbin's patrol car. However, Alva had unwittingly informed officers that plaintiff owned the radio and plaintiff was subsequently charged with illegally possessing the radio. At trial, plaintiff admitted that he had "dropped" the radio in Durbin's patrol car.

**USE OF FORCE**

{¶ 73} Plaintiff's claim for negligent retention and supervision is premised on his assertion that Miller used excessive force when he placed plaintiff under arrest, threatened to shoot him, "dragged" him to the patrol vehicle, and placed him on the road where he was in danger of being struck by a passing vehicle.

{¶ 74} Plaintiff's assertion that Miller threatened several times to shoot him is less than credible given the fact that Miller was aware that plaintiff was recording their conversation. Furthermore, the recorded statements that were made by Alva at the conclusion of the incident are inconsistent with plaintiff's assertion that Miller threatened to shoot him.

{¶ 75} "ALVA:      Well, I seen what he did, so I'm going to file something, I don't know --

{¶ 76} "BRAD:      What'd I do?

{¶ 77} "RANDY:    It's all on tape so

{¶ 78} "(unintelligible).

{¶ 79} "BRAD:      I didn't do anything.

{¶ 80} "(Unintelligible)

{¶ 81} "ALVA:      You – you seen what he did to him, too.

{¶ 82} "SPEAKER:    What?

{¶ 83} "ALVA:      I said, you seen what he did to him after he was handcuffed, didn't you?

{¶ 84} "(Unintelligible comment.)

{¶ 85} "ALVA:      He pushed him, put his knee in his back.  So you seen that, didn't you?

{¶ 86} "SPEAKER:    Oh, yes.

{¶ 87} "ALVA:      He don't have to do that.

{¶ 88} "SPEAKER:    We'll see.  We'll see."  (Defendant's Exhibit C, Page 17 Lines 1-3.)

{¶ 89} The recording also shows that Alva voiced his concern about the procedure that Miller used to handcuff and arrest plaintiff, rather than expressing any concern of a threat to shoot plaintiff.  Although Alva did subsequently comment that Miller pointed his weapon at plaintiff's head, Miller admitted that he had pointed his weapon at all of the members of the hunting party, including pointing the pistol at plaintiff at close range, prior to placing plaintiff in handcuffs.  Similarly, where plaintiff can be heard complaining about Miller's arrest procedure, plaintiff expressed his concern with Miller as follows:  "He pulled guns on people who had guns – the guns was unloaded, laying in the grass."  (Defendant's Exhibit C, Page 17, Lines 1-3.)

{¶ 90} Additionally, the testimony of the members of the hunting party was inconsistent with regard to Miller's use of force against plaintiff.  Machael Hartsook and Jerry Hoeflich both testified that Miller threatened to shoot plaintiff only once; plaintiff and Brian Hoeflich testified that Miller twice yelled that he would shoot plaintiff; and Alva and Bradley Wilhelm testified that Miller threatened to shoot plaintiff three times. Plaintiff's witnesses also gave conflicting testimony  as to whether Miller grabbed plaintiff's hair while threatening to shoot him and regarding Miller's use of pepper spray.

{¶ 91} Plaintiff alleges that Miller dragged him across the road to the patrol vehicle, thereby causing "open sores" and "deep bruises that lingered for days."

(Complaint at ¶54.) However, plaintiff testified that he was wearing heavy hunting clothes and during cross-examination he admitted that he was not injured in any manner while being moved to the patrol vehicle; he specifically admitted that he did not suffer open sores.

{¶ 92} Although plaintiff alleges that he feared for his life when he was forced to sit on the road next to defendant's patrol vehicle, the testimony established that defendant's vehicle was parked at the edge of the road, that the roadway was straight, and that visibility along the road was good with no obstructions. Furthermore, Officer Durbin testified that his patrol vehicle was parked in the road with the emergency lights activated to alert passing drivers. Durbin, Miller, and Runnels each testified that they had stood in the roadway near the patrol vehicles and that neither they nor plaintiff was in danger of being struck by a passing vehicle.

{¶ 93} Michael Taylor, defendant's chief of law enforcement, testified regarding arrest procedures and defendant's policies for the use of force. Taylor testified that after Miller and Runnel had verified Bradley's identity, they had a duty to arrest him for possessing a weapon under disability. Taylor stated that Miller's use of force involved both placing plaintiff on the ground and pointing his service weapon at the members of the hunting party. Taylor noted that plaintiff did not comply with Miller's initial attempt to gain control by raising his voice. Taylor testified that Miller's prior knowledge of plaintiff was an important factor to consider in assessing Miller's decision to place plaintiff on the ground during the arrest. Taylor explained that Miller attempted to de-escalate the confrontation by holstering his weapon and threatening to use pepper spray to gain plaintiff's compliance before he forced plaintiff to the ground. Taylor emphasized that it was reasonable for the officers to draw their weapons on the unarmed hunters inasmuch as the officers were attempting to control a dispersed group of six hunters who were in close proximity to firearms that could be quickly reloaded. Taylor opined

that Miller used appropriate techniques to control the scene after plaintiff failed to comply with his orders.

{¶ 94} Based upon the testimony and evidence, the court finds that plaintiff has failed to prove by a preponderance of the evidence that Miller was in any manner incompetent in his arrest of plaintiff. As stated above, the testimony that Miller threatened to shoot plaintiff was not credible. The tape recording corroborated the testimony of Miller and Runnels that plaintiff became uncooperative and belligerent when Miller attempted to apprehend Bradley Wilhelm. The court finds that Miller was reasonably cautious in his interaction with the members of the hunting party and that Miller did not use excessive force at any time during his apprehension and arrest of plaintiff. Moreover, inasmuch as plaintiff has failed to prove either that Miller threatened to shoot him or that plaintiff was in danger when he sat next to defendant's patrol vehicle, and in light of plaintiff's admission that he was not physically injured during the arrest, plaintiff cannot prevail on a claim of negligent retention and supervision.

{¶ 95} For the foregoing reasons, it is recommended that plaintiff's claim of selective enforcement be dismissed, and that judgment be rendered in favor of defendant on plaintiff's claims of false imprisonment, assault, battery, intentional infliction of emotional distress, intimidation, and negligent retention and supervision.

*A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed. A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

_____
ANDERSON M. RENICK
Magistrate


cc:


Daniel R. Forsythe            Leonard W. Yelsky
Peter E. DeMarco             Norman L. Sirak
Assistant Attorneys General    75 Public Square
150 East Gay Street, 18th Floor   Cleveland, Ohio 44113
Columbus, Ohio 43215-3130

AMR/cmd
Filed December 14, 2009
To S.C. reporter January 5, 2010