TOLEDO HEART SURGEONS, INC. et al., Appellees,

v.

TOLEDO HOSPITAL et al., Appellants.

[Cite as *Toledo Heart Surgeons, Inc. v. Toledo Hosp.,*
154 Ohio App.3d 694, 2003-Ohio-5172.]

Court of Appeals of Ohio,
Sixth District, Lucas County.

No. L–02–1059.

Decided Sept. 30, 2003.

Sandra A. Westfall, Karen A. Novak, Andrew B. Wachler and Robert S. Iwrey, for appellees.

Cary Rodman Cooper, for appellants.

KNEPPER, Judge.

{¶ 1} This is an appeal from the judgment of the Lucas County Court of Common Pleas, which granted the motion for summary judgment filed by appellees, Toledo Heart Surgeons, Inc. and Xavier Mousset, M.D. (collectively referred to as "Dr. Mousset"), against the Toledo Hospital and ProMedica Health System, Inc. (collectively referred to as "the hospital") on their counterclaims alleging defamation and disparagement.

{¶ 2} On May 15, 2000, Dr. Mousset sought a temporary restraining order against the hospital on claims arising out of the hospital's refusal to renew his contract, which was granted.[1] On June 12, 2000, the hospital filed counterclaims against Dr. Mousset, alleging defamation and disparagement, arising out of statements made by Dr. Mousset on his website, http://patientsshouldchoose.com, to the news media, in published newspaper ads, and in letters to physicians and patients. The trial court granted the hospital summary judgment on Dr. Mousset's claims, which Dr. Mousset appealed. Dr. Mousset's appeal, however, was fully dismissed by this court on October 15, 2002. Accordingly, the only issues on appeal concern the trial court's grant of summary judgment to Dr. Mousset against the hospital on its defamation and disparagement counterclaims.

{¶ 3} The hospital raises the following assignments of error:

{¶ 4} "First Assignment of Error:

{¶ 5} "The trial court erred in holding that Dr. Mousset's statements accusing the Toledo Hospital and ProMedica of making anticompetitive deals and of engaging in many anticompetitive business practices were not actionable, defamatory statements of fact, but rather were protected opinions.

{¶ 6} "Second Assignment of Error:

---

1. On July 19, 2000, Dr. Mousset filed a complaint for declaratory judgment.

{¶ 7} "The trial court erred in holding that Dr. Mousset's statements that the Toledo Hospital and ProMedica unlawfully failed to maintain an open medical staff and thereby risked losing millions of dollars annually were not actionable, defamatory statements of fact, but rather were protected opinions.

{¶ 8} "Third Assignment of Error:

{¶ 9} "The trial court erred in dismissing the Toledo Hospital's disparagement claim."

{¶ 10} Upon thorough review of the record, applicable law, the hospital's arguments on appeal, and the decision of the trial court, we find that the trial court correctly considered the pertinent facts and issues in dispute, correctly applied the law to the facts, and rendered judgment accordingly. We therefore adopt the well-reasoned decision of the trial court as our own. (See *Toledo Heart Surgeons, Inc. v. Toledo Hosp.* (Nov. 16, 2001), Lucas C.P. No. CI2000–2618, at ¶ 12–35, attached hereto as Appendix A.)

{¶ 11} The hospital's assignments of error are therefore found not well taken. On consideration whereof, the court finds that substantial justice has been done the party complaining and that the judgment of the Lucas County Court of Common Pleas is affirmed. The hospital is ordered to pay the court costs of this appeal.

Judgment affirmed.

MARK L. PIETRYKOWSKI and ARLENE SINGER, JJ., concur.

## APPENDIX A

Decided Nov. 16, 2001

JUDITH ANN LANZINGER, Judge.

## MOTION FOR SUMMARY JUDGMENT ON COUNTERCLAIMS

{¶ 12} The plaintiffs have filed a motion for summary judgment on the counterclaims of defamation and disparagement. The court agrees that disparagement is duplicative rather than separate from the defamation claim and, therefore, dismisses the Second Claim for Relief outright. See, e.g., *Blue Cross & Blue Shield of Ohio v. Schmidt* (Feb. 16, 1996), Lucas App. No. L–94–291, 1996 WL 71006 (when quality of a business's goods or services has been demeaned a commercial disparagement claim may be asserted; if allegations relate to integrity, defamation is proper claim).

{¶ 13} Summary judgment motions are to be resolved in light of the dictates of Civ.R. 56. Civ.R. 56(C) states:

"Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of

evidence in the pending case, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law * * *. A summary judgment shall not be rendered unless it appears from such evidence or stipulation and only therefrom, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, such party being entitled to have the evidence or stipulation construed most strongly in his favor."

{¶ 14} Summary judgment is not to be entered if it appears that a material fact is genuinely disputed. In order to survive a motion for summary judgment, the nonmoving party must produce evidence on any issue to which that party bears the burden of production at trial. *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 570 N.E.2d 1095.

{¶ 15} To establish a case of defamation, a plaintiff must show (1) that a false statement of fact was made; (2) that the statement was defamatory (i.e., ruinous to reputation); (3) that the statement was published; (4) that the plaintiff suffered injury as a proximate result of the publication; and (5) that the defendant acted with the required degree of fault in publishing the statement. See *Pollock v. Rashid* (1996), 117 Ohio App.3d 361, 368, 690 N.E.2d 903.

{¶ 16} The Hospital counterclaimants support their opposition to the motion with the affidavits of Ursula Strausbaugh, Dean Vanderhoof, Greg Burton, and Barbara Steele, and the depositions of B.J. Fischer, Mark Luetke, and Dr. Xavier Mousset. They complain of a number of statements—several within their counterclaim and others within their brief in opposition. The statements set forth in the counterclaims' first claim for relief are:

a.   The Hospital decided to deny patients the right to life-saving treatment;

b.   The Hospital placed politics and power ahead of patient care;

c.   The Hospital's President testified that the Hospital is not required to follow due process;

d.   The Hospital terminated the privileges of Drs. Mousset and Levy and did not state an official reason. (Paragraph 2 of Counterclaim.)

{¶ 17} The Hospital alleges that these statements were made on an Internet website,[2] to the news media, and in published newspaper ads and letters mailed to patients and physicians. In addition, the statements complained of in the brief accompanying defendants' opposition are:

1.   The Hospital terminated Dr. Mousset's cardiac surgery privileges;

---

2.   The URL for the website was *http://patientsshouldchoose.com.* It no longer is accessible.

2. The Hospital acted unfairly and violated the Medical Staff Bylaws;

3. The Hospital decided to enter into an exclusive agreement with CSNO for economic and political reasons without regard for patient care;

4. The Hospital illegally "closed" the medical staff and jeopardized its non-profit status, risking the loss of millions of dollars by entering into the agreement;

5. The Hospital administrators, described as bureaucrats, acted unprofessionally and unconscionably; and

6. The Hospital engaged in many illegal, anti-competitive business activities.

{¶ 18} The foregoing statements were not specifically set forth in the answer to interrogatories requested by the plaintiffs. Nor were the following statements mentioned in their brief, where counterclaimants refer to the following statements within patient letters and website:

1. ProMedica "terminated the privileges * * * of Drs. Mousset and Levy."

2. "These privileges were terminated without due process, as required by the medical staff By-laws."

3. "Barbara Steele testified that she is not required to follow basic due process rights as required by the medical staff by-laws."

4. "ProMedica has decided to deny patients' right to life-saving treatment from the practice that allowed Toledo Hospital to be named to the 100 Top Hospital: Cardiovascular Hospitals by Modern Health Care. * * *"

5. "It means that politics and personalities were placed ahead of patient care."

6. "* * * If ProMedica could hand-pick who practices medicine * * * it seriously jeopardizes each physician's freedom to treat patients as they were trained."

{¶ 19} Ursula Strausbaugh's affidavit alleges that Mousset acted with the intent to close down the cardiac surgery program. The Hospital claims that it was injured by this negative publicity and that it incurred significant expense to advance a positive publicity campaign in response. Barbara Steele asserts that the Hospital expended $34,024.30 for this purpose. (Steele aff. ¶ 6.) Defendants also seek $25,000 in punitive damages, alleging that Mousset made these statements with malice.

{¶ 20} The Hospital counterclaimants have offered evidence on the publication of the statements, their allegations of injury as a result, and their allegations of Mousset's acting with intent. The important question, which is one of law for the court, is whether these statements are "defamatory" or whether they are nonactionable opinion statements.

{¶ 21} Section 11, Article I of the Ohio Constitution protects the expression of opinions. It provides: "Every citizen may freely speak, write, and publish his

sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech, or of the press." The Supreme Court of Ohio in *Scott v. News–Herald* (1986), 25 Ohio St.3d 243, 25 OBR 302, 496 N.E.2d 699, paragraph one of the syllabus, articulated the distinction between fact and opinion and explained: "The totality of the circumstances must be examined to determine whether a published statement is constitutionally protected opinion." The "totality of the circumstances" can be determined through a four-part test that the court originally approved in *Scott* and clarified in *Vail v. Plain Dealer Publishing Co.* (1995), 72 Ohio St.3d 279, 649 N.E.2d 182. This test considers at least four factors: first, the specific language used; second whether the statement is verifiable; third, the general context of the statement; and fourth, the broader context in which the statement appeared. The standard is not rigid but must be fluid. As the *Vail* court noted: "Every case will present facts that must be analyzed in the context of the general test. Each of the four factors should be addressed, but the weight given to any one will conceivably vary depending on the circumstances presented." *Vail* at 282, 649 N.E.2d 182.

{¶ 22} Vail, a candidate for the Ohio Senate, had sued the Plain Dealer and a columnist after an allegedly defamatory article about her appeared in the newspaper's Forum section. The article, entitled "Gay-basher takes refuge in the closet," stated that Vail "doesn't like gay people" and that she "added gay-bashing to the repertoire of right-wing, neo-numbskull tactics she is employing * * * in her increasingly distasteful campaign." 72 Ohio St.3d at 279, 649 N.E.2d 182. Other statements in the article accused Vail of engaging in "anti-homosexual diatribe," and stated, among other things, that "Vail wouldn't be the first candidate to latch onto homophobia as a ticket to Columbus." Id. In analyzing the statements, the Supreme Court found that the general context of the article was opinion and that the general tenor of the article was sarcastic, thus "more typical of persuasive speech than factual reporting." 72 Ohio St.3d at 282, 649 N.E.2d 182. Additionally, the specific language used in the article would be understood to be "one person's attempt to persuade public opinion." *Vail* at 283, 649 N.E.2d 182. And finally, the statements were not verifiable. Without a plausible method of verification, a reasonable reader would not believe that the statement had specific factual content. Because the newspaper's column constituted an opinion, it was constitutionally protected.

{¶ 23} The Supreme Court of Ohio recently determined that constitutional protection for expressed opinion is not limited to media defendants. *Wampler v. Higgins* (2001), 93 Ohio St.3d 111, 752 N.E.2d 962. Wampler had sued Higgins for defamation in the Common Pleas Court of Pickaway County, alleging that

Higgins had falsely stated in a letter to the newspaper that Wampler had forced McKee out of business by charging exorbitant rent, describing Wampler as a "ruthless speculator." Applying the *Scott–Vail* test, the Supreme Court concluded that under the totality of the circumstances, "the language used by defendant in his letter would be understood by the ordinary reader for just what it is — one person's frustration with the perceived plight of many small downtown areas due to small business closures and large corporate takeovers. * * * [T]he average reader would believe that statements contained in defendant's letter are the opinions of the writer and not facts." 93 Ohio St.3d at 113–114, 752 N.E.2d 962.

{¶ 24} The Sixth District Court of Appeals distinguished between fact and opinion in *El–Shiekh v. Northwest Ohio Cardiology Consultants* (Sept. 15, 2000), Lucas App. No. L–99–1380, 2000 WL 1298761. There, physicians who were in charge of El–Shiekh's training at Toledo Hospital were found entitled, in the interest of public health and safety, to express concerns or dissatisfaction with his performance. El–Shiekh had acknowledged in deposition that the letters included only subjective opinions regarding his performance. The physician letters were found to be protected opinion.

{¶ 25} Here, Mousset responded throughout his deposition that all the statements being challenged by the Hospital were expressions of "his opinion." Thus, the four *Vail* factors need to be examined.

## A. General Context

{¶ 26} First, the several statements complained of will first be placed in context rather than isolated. The statements appeared on the Internet and in letters to doctors and patients. As far as publication on the website, the marketplace of ideas has widened to include computer communications, and an ordinary 'surfer' is attuned to the blend of hyperbole and exaggeration in the expression of opinion that is contained on the Internet.[3] Letters sent to physicians and patients clearly related to Mousset's advocacy of his position involving his lawsuit against the Hospital. In his opinion, he was being treated unfairly, and he commented in response. Thus, he comments that the Hospital's decision "seriously jeopardizes each physician's freedom to treat patients as they were trained."

{¶ 27} Mousset hired a public relations firm (see deposition of Mark Luetke, president of Funk, Luetke and Skunda) to advocate his position and obtain

---

3. Certain statements were placed on the website as "fact." The Hospital argues that the "facts" are incomplete because they have not been properly updated. The website, however, no longer appears. Viewed in context, a reader would see that statements were meant to persuade and generate an emotional response rather than to falsely state "fact."

support. As such, his comments were made as expressions of opinion over perceived unjust treatment. The overall tenor of the remarks may have been emotional and ill advised. They are, however, constitutionally protected opinion; as such, they are not actionable.[4]

## B. Broader Context

{¶ 28} All statements relate either to the Hospital's decision to renew only one of two exclusive cardiac surgical services contracts or to the purported consequences of that decision. As seen in previous rulings in this case, Ohio law upholds exclusive contracts of the type involved here. See, e.g., *Holt v. Good Samaritan Hosp. & Health Ctr.* (1991), 58 Ohio St.3d 701, 569 N.E.2d 504; *Williams v. Hobbs* (1993), 9 Ohio App.3d 331, 9 OBR 599, 460 N.E.2d 287; *Gonzaga v. Massillon Community Hosp.* (Nov. 15, 1990), Stark App. No. 90–332. The Hospital prevailed on the law and will be compensated for damages it sustained by virtue of the TRO. The case record, however, also demonstrates that plaintiffs consistently advocated a contrary view of the law. Mousset was obviously frustrated over the nonrenewal of his and Levy's contract. He strenuously advanced his position that his "privileges were terminated," since he could no longer perform cardiac surgery at the Hospital. His arguments had initial appeal, as can be seen by this court's improvident grant of the TRO. When common meaning is given to the terms used, it is understandable how a party could argue that by entering a new exclusive contract, the Hospital "terminated Dr. Mousset's cardiac surgery privileges." Mousset had been allowed to practice surgery before; now he could not. Although this court eventually held under Ohio law that his position was inaccurate, the characterizations themselves were not totally unreasonable.[5] The same holds true for the statement that "the Hospital acted unfairly and violated the Medical Staff Bylaws." Barbara Steele's testimony was that under the circumstances (i.e., nonrenewal of contract) the bylaws were not implicated and so did not apply to Mousset's situation. In context, these statements are not defamatory.[6]

---

4. The defenses of substantial truth and innocent construction have also been advanced by the plaintiffs. As the statements are found to be constitutionally protected opinion, discussion of these points is unnecessary.

5. "Reduction" in privileges and "termination" of privileges have special legal meanings. Suffice it to say that the Hospital unquestionably has the right to enter exclusive contracts— one of which lies at the heart of this case.

6. The Strausbaugh affidavit offers statements of Mousset's malicious intent. However, *Vail v. Plain Dealer Publishing Co.* (1995), 72 Ohio St.3d 279, 649 N.E.2d 182, clearly indicates that

### C. Specific Language Used

{¶ 29} This factor focuses on the common meaning ascribed to the words by an ordinary reader. Statements "loosely definable or variously interpretable" cannot in most contexts support a claim for defamation. Here, the language complained of can be understood by the ordinary reader to be the result of acrimony between the doctor and his former hospital. The language at issue is value-laden and subjective in its point of view. The phrases complained of are in many instances capable of being interpreted in various subjective ways. For example, that the Hospital acted "unprofessionally and unconscionably," or that it entered into the new agreement "for economic and political reasons without regard for patient care," or that "politics and personalities were placed ahead of patient care," are not precise and cannot be construed as objective. The language conveys subjective interpretation rather than objective fact.

### D. Verifiability

{¶ 30} Because opinion, as a matter of law, cannot be proven false, the remarks must be measured to see whether they are capable of proof or disproof. Many of Mousset's statements are standardless characterizations. Without a plausible method of verification, a reasonable reader will not believe that a statement has specific factual context. Comments such as that the Hospital decided to "deny patients the right to life-saving treatment," "illegally closed the medical staff and jeopardized its non-profit status risking the loss of millions of dollars by entering into the agreement," and "engaged in many illegal, anti-competitive business activities," all relate to Mousset's unverifiable opinion over his contract nonrenewal. *Scott v. News–Herald* (1986), 25 Ohio St.3d 243, 251–252, 25 OBR 302, 496 N.E.2d 699. They are one person's opinion only: Mousset's.

### Conclusion

{¶ 31} In summary, when viewed against the *Scott–Vail* test, the counterclaims of defamation must fail, and plaintiffs are entitled to summary judgment.

{¶ 32} IT IS ORDERED:

{¶ 33} That the court finds that the TRO should not have been issued on May 16, 2000, in this case, and that the defendants' motion for damages on bond is therefore GRANTED. Plaintiffs shall pay a sum of no more than $75,000 as established by stipulation of the parties or by a hearing on damages on December 20 at 1:30 p.m.; and

---

Section 11, Article I of the Ohio Constitution provides a broader protection than that of the First Amendment. "Once a determination is made that specific speech is 'opinion,' the inquiry is at an end." *Vail*, 72 Ohio St.3d at 284, 649 N.E.2d 182.

{¶ 34} IT IS FURTHER ORDERED:

{¶ 35} That plaintiffs' motion for summary judgment on defendants' counter-claims is GRANTED.  All counts against plaintiffs are dismissed with prejudice.