**Barbara E. EISNNICHER, et al., Plaintiffs,**

v.

**BOB EVANS FARMS RESTAURANTS, et al., Defendants.**

No. 2:02–cv–1020.

United States District Court, S.D. Ohio, Eastern Division.

March 31, 2004.

James Donald McNamara, Columbus, OH, for Plaintiffs.

Chris Joseph North, Mark A Knueve, Vorys, Sater, Seymour & Pease, Mark David Landes, Aaron Michael Glasgow, Isaac, Brant, Ledman & Teetor, Columbus, OH, for Defendants.

## OPINION AND ORDER

MARBLEY, District Judge.

### I. INTRODUCTION

This matter is before the Court on several of the parties' Motions for Summary Judgment. Defendants Bob Evans Farms Restaurants, Inc. ("Bob Evans") and Natterious Manson (collectively the "Bob Evans Defendants") filed their Motion on August 8, 2003. Plaintiff Barbara Eisnnicher filed a Motion for Partial Summary Judgment on September 2, 2003. Finally, Defendants City of Westerville, George Abbot, Stacy Coe, Gene Hunter, Carrie Martz, and Kurt Nightingale (collectively the "Westerville Defendants") filed their Summary Judgment Motion on September 2, 2003. For the following reasons, the Court **GRANTS** in part and **DENIES** in part the Westerville Defendants' Motion for Summary Judgment, **DENIES** Plaintiff Barbara Eisnnicher's Motion for Partial Summary Judgment, and **GRANTS** in part and **DENIES** in part the Bob Evans Defendants' Motion for Summary Judgment.

### II. FACTS

The following facts appear to be undisputed.

On the morning of April 6, 2002, Plaintiff Barbara Eisnnicher, her son, Plaintiff Joseph Eisnnicher, and a friend, Plaintiff Matt Austin, went to breakfast at their local Bob Evans Restaurant, located at 69 Huber Village Boulevard, Westerville, Ohio. Plaintiffs, regular patrons at the Bob Evans, arrived at the restaurant around 11:30 a.m. They waited in the waiting area for some time before being seated. Defendant Natterious Manson was the Assistant Manager in charge of the shift when Plaintiffs arrived. Manson was one of two supervisors on duty in the restaurant at the time.

At approximately 12:05 p.m., Manson pushed a "silent" alarm button used to contact the Westerville Police Department and inform it that a robbery is in progress at the restaurant. Several officers were dispatched to the restaurant to investigate the alarm. Meanwhile, Manson spoke with the police dispatcher by telephone. Manson informed the dispatcher that there was not a hold up in progress but that there were suspicious customers in the restaurant and that he would meet the officers at the back door to explain why he pushed the alarm.

Within about five minutes of the alarm being pushed, the police arrived. Manson provided a physical description of Plaintiffs Joseph Eisnnicher and Matt Austin and informed the police that three separate tables of customers had complained about Eisnnicher and Austin. Manson stated that all three sets of customers flagged him down to tell him that Eisnnicher and Austin had been discussing bank robberies and "jobs." Manson also directed the police to Eric Greber, a Bob Evans prep cook employee. Greber told the police that he recognized Joseph Eisnnicher from an episode of "Crime Stoppers" that he had seen the previous day. Greber described Eisnnicher and said that he had been featured on the television program as a wanted felon sought by the authorities for bank robbery. The police also were aware, at the time, that there had recently been several bank robberies in the Columbus area, and that this particular Bob Evans restaurant had been robbed in the past.

Based on this information, the police stationed themselves around the restaurant and asked Manson to call them when Plaintiffs left. At approximately 1:00 p.m., Plaintiffs left the restaurant, got into their vehicle, and drove away from Bob Evans. Several police cruisers, with lights activat-

ed, converged behind the vehicle and brought it to a stop in the parking lot of an adjacent strip mall. As soon as the car stopped, Barbara Eisnnicher, who was sitting in the passenger seat of the car, jumped out of the car and confronted the police officers about why the car had been stopped. Officers had their guns drawn, and they instructed Joseph Eisnnicher to throw his car keys out of the window and ordered Plaintiffs to exit the car, one at a time, place their hands on their heads, walk backwards to the police, and kneel on the pavement.

Barbara Eisnnicher was ordered in a "forceful tone" to put her hands up, to move to a specific location and stay there, and to "shut up." During the encounter, Mrs. Eisnnicher was highly agitated and continued to speak loudly to the officers. At one point, she poked her finger into Detective Hunter's chest as he attempted to calm her and explain the reasons for the stop. At another point, she reached into the car for her purse, retrieved a cell phone from the purse, and proceeded to make phone calls. At no time during the stop did any of the officers touch Mrs. Eisnnicher, threaten her, or inform her that she was under arrest.

Meanwhile, the men were secured with handcuffs, patted down for weapons, and placed in separate cruisers. Officers Coe and Nightingale spoke with Eisnnicher and Austin, asking for basic biographical information and for information about their conversations while at the restaurant. Neither Eisnnicher nor Austin was informed that he was under arrest, and neither was ever threatened. The officers ran routine background checks on Eisnnicher and Austin, including checks for outstanding warrants and verification on the status of the vehicle. When nothing suspicious was discovered, the police released Plaintiffs. As documented by the police cruiser video camera in Officer Martz's cruiser, the stop lasted approximately 15 to 17 minutes.

At the conclusion of the stop, Plaintiffs returned to the restaurant to confront Manson. Barbara Eisnnicher requested that several officers accompany Plaintiffs to the Bob Evans for assistance. None of these events, however, was ever televised or published in a newspaper, and none of Plaintiffs was ever approached by any friends and asked about them. Neither Austin nor Joseph Eisnnicher suffered any wage loss. Barbara Eisnnicher voluntarily missed work on April 8, 2002, to go to the doctor to get a refill on her prescription for Valium, which she had previously taken on a periodic basis.

## III. PROCEDURAL HISTORY

On September 20, 2002, Plaintiffs, Barbara Eisnnicher, Joseph Eisnnicher, and Matt Austin, filed a Complaint against Defendants, City of Westerville, George Abbott, Stacy Coe, Gene Hunter, Carrie Martz, Kurt Nightingale, Bob Evans, and Natterious Manson in the Franklin County Court of Common Pleas. The case was removed to this Court on October 15, 2002. The First Amended Complaint, filed February 19, 2003, seeks compensatory and punitive damages based on the following claims: (1) negligence and/or gross negligence; (2) false arrest and imprisonment; (3) defamation by Defendant Manson; (4) violations of the Fourth Amendment of the United States Constitution and 42 U.S.C. § 1983; and (5) failure to adequately train, supervise, and discipline police officers by Defendant City of Westerville.

On October 17, 2003, Plaintiffs stipulated to the dismissal of all state tort claims against Defendants Abbott, Coe, Hunter, Martz, and Nightingale. Also on that date, Plaintiffs voluntarily dismissed with prejudice all claims against Defendant City

of Westerville. In their September 10, 2003, response to the Bob Evans Defendants' Motion for Summary Judgment, Plaintiffs clarified that they were not asserting any § 1983 or other federal claims against the Bob Evans Defendants.

This matter is before the Court on Motions for Summary Judgment filed by both the Westerville Defendants and the Bob Evans Defendants, as well as a Motion for Partial Summary Judgment filed by Plaintiff Barbara Eisnnicher. In her Motion for Partial Summary Judgment, Barbara Eisnnicher seeks summary judgment only as to her claims against the Westerville Defendants.

## IV. STANDARD OF REVIEW

■ The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation. *Taft Broad. Co. v. United States,* 929 F.2d 240, 248 (6th Cir.1991). Summary judgment is appropriate "[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the non-moving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.,* 12 F.3d 1382, 1388–89 (6th Cir.1993). Significantly, in responding to a motion for summary judgment, however, the non-moving party "may not rest upon its mere allegations ... but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P.56(e); *see Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Searcy v. City of Dayton,* 38 F.3d 282, 286 (6th Cir.1994).

The non-moving party must present "significant probative evidence" to show that there is more than "some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.,* 8 F.3d 335, 339–40 (6th Cir.1993). Furthermore, the mere existence of a scintilla of evidence in support of the non-moving party's position will not be sufficient; there must be evidence on which the jury could reasonably find for the non-moving party. *Copeland v. Machulis,* 57 F.3d 476, 479 (6th Cir.1995) (citing *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505).

## V. ANALYSIS

### A. The Westerville Defendants' Motion

Plaintiffs contend that the Westerville Defendants, police officers for the City of Westerville, are liable under § 1983 for violating their Fourth Amendment right to be free from unreasonable searches and

seizures. In their Motion for Summary Judgment filed pursuant to Rule 56, the Westerville Defendants argue, first, that they did not deprive Plaintiffs of a constitutional right because (1) there was reasonable and articulable suspicion for the investigatory stop of Plaintiffs and (2) the force applied to effect the stop of Plaintiffs was reasonable and appropriate under the circumstances and, second, that they are entitled to qualified immunity. Plaintiffs counter that there was no reasonable, articulable suspicion sufficient to justify the detention of any of the three Plaintiffs and that the use of a full "felony take down" procedure and pat down searches for Plaintiffs Joseph Eisnnicher and Matt Austin were excessive under the circumstances.

### 1. *42 U.S.C. § 1983 Claims Against Officers*

Section 1983 provides:

Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983.

■ There are two essential elements of a § 1983 claim: (1) "there must be a deprivation of the plaintiff's '... rights, privileges, or immunities secured by the Constitution and laws ....' of the United States;" and (2) "the plaintiff must allege that the defendants deprived him of this constitutional right 'under color of any statute, ordinance, regulation, custom, or usage', of any State or Territory." *Dunn v. Tennessee,* 697 F.2d 121, 125 (6th Cir. 1982) (citations omitted). To succeed, the

plaintiff must show that: (1) a person (2) acting under color of state law (3) deprived him of rights secured by the United States Constitution or its laws. *Waters v. City of Morristown,* 242 F.3d 353, 358–59 (6th Cir. 2001). By its terms, however, § 1983 creates no substantive rights; it merely provides remedies for deprivations of established rights. *See City of Okla. City v. Tuttle,* 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (citation omitted).

Here, there is no question that the Westerville Defendants were acting under color of state law while engaged in the conduct at issue in this case. The only question is whether that conduct actually violated Plaintiffs' Fourth Amendment rights, either because the stop itself was not supported by a reasonable and articulable suspicion of wrongdoing or because the amount of force used to effect the stop or the length of the stop was excessive under the circumstances.

### a. *Reasonableness of the Detentions*

■ The Fourth Amendment generally protects persons from being seized by law enforcement officers without probable cause. Law enforcement officers briefly may stop an individual for investigation, however, if they have a "reasonable suspicion" that the individual has committed a crime. *United States v. Palomino,* 100 F.3d 446, 449 (6th Cir.1996); *see Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "Reasonable suspicion" is more than an ill-defined hunch; it must be based upon "a particularized and objective basis for suspecting the particular person ... of criminal activity." *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). "Reasonable suspicion" requires "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" an investigatory stop.

*Terry,* 392 U.S. at 21, 88 S.Ct. 1868; *see United States v. Erwin,* 155 F.3d 818, 822 (6th Cir.1998).

 The level of suspicion required for a so-called *"Terry* stop" "is considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); *McPherson v. Kelsey,* 125 F.3d 989, 993 (6th Cir.1997). Moreover, the evidence can be less reliable than what is required to show probable cause. *Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). Both the amount of information possessed by police to indicate commission of a crime and the reliability of that information are considered in the "totality of the circumstances—the whole picture that must be taken into account when evaluating whether there is a reasonable suspicion." *Id.* at 330, 110 S.Ct. 2412 (internal citation and quotations omitted).

The Westerville Defendants argue that when the decision was made to effect a stop of Plaintiffs' vehicle, the police possessed the following information to support that decision: (1) at least six customers sitting at three tables spread throughout the restaurant complained to a manager that customers identified as Joseph Eisnnicher and Matt Austin were discussing their participation in bank robberies in the past, plans for future bank robberies, and running from the police;[1] (2) the three sets of complaining customers were independent of each other and had no reason to collaborate; (3) the conversation about bank robberies was sufficiently intimidating not only to attract the attention of these independent witnesses, but to cause them to complain to the management; (4) the complaints were sufficiently credible to cause the manager to activate the emergency "silent" alarm; (5) the customers who had complained to the manager had left the restaurant; (6) another employee at Bob Evans positively identified one of the individuals as a criminal who was wanted for previous robbery offenses and had recently been featured on a crime-related television show; (7) there was no apparent reason to suspect the credibility of the manager or the other employee or to suspect an ulterior motive for them to lie; and (8) there had been numerous robberies in that area, and this particular restaurant had been robbed before.

Plaintiffs urge the Court to consider the claims of each Plaintiff separately rather than assuming that each piece of information possessed by the police applied to all three Plaintiffs equally. Plaintiffs incorporate the arguments relating to Barbara Eisnnicher's Motion for Partial Summary Judgment, which asserts that the Westerville Defendants had no particularized suspicion that Mrs. Eisnnicher had engaged in any criminal activity and therefore had no justification for detaining her. Plaintiffs further argue that because there are disputed facts, and because the facts before the police were inherently unreliable, the reasonableness of the seizure must be reserved for the jury.

1. According to Officer Martz, when Manson met her at the back door of the restaurant, he told her that three separate groups of customers, seated at different locations throughout the restaurant, independently contacted him and provided the same basic information based on a conversation overheard while in the waiting area waiting to be seated. This information was that Eisnnicher and Austin "had been talking about doing bank robberies . . . and how they've done previous bank robberies and they were going to be staking out a place to do another bank robbery, and that they had been running from the police and like bragging that they hadn't been caught." Martz states that Manson told her, when she arrived, that all the complaining customers had already left the restaurant.

### (1) Joseph Eisnnicher

■■■ As to Joseph Eisnnicher, the police had the benefit of all of the information outlined above. Not only had three separate groups of customers mentioned overhearing Eisnnicher discussing bank robberies, but Greber told the police that he was positive that Eisnnicher was the same person he had seen on the previous evening's episode of "Crime Stoppers," a television program that features fugitive criminals. Greber stated he was "certain" that Eisnnicher was a wanted bank robber named "Sphinx."

Plaintiffs point to discrepancies between what Martz says that she was told and what Manson says that he told police, arguing that because there is a dispute as to exactly what the police were told, the issue of whether the stop of Eisnnicher was reasonable is a question for the jury to decide. This argument is meritless. First of all, the discrepancies noted by Plaintiffs are minor. Plaintiffs point out that Manson denied telling police that the customers had reported that Plaintiffs said they were going to be staking out another place to do another bank robbery. Manson also denied telling the police that the complaining customers had left the restaurant. Even under the version as related by Manson, the Westerville Defendants still had enough information to warrant an investigative stop of Eisnnicher, especially when that information was coupled with Greber's independent report that he had seen Eisnnicher on "Crime Stoppers." Plaintiffs have not established a genuine issue of material fact as to the reasonableness of the Westerville Defendants' stop of Eisnnicher.

### (2) Matt Austin

■■■ As to Plaintiff Matt Austin, the Westerville Defendants lacked what was arguably the most important piece of information relating to Joseph Eisnnicher:

Greber's report of recognizing Eisnnicher from a fugitive criminal program. Defendants, however, still had the information regarding the conversations about bank robberies, as well as the fact that Austin was conducting these conversations with Eisnnicher, a suspected fugitive bank robber. The totality of the information known to the officers at the time was sufficient to preclude any reasonable jury from finding that the Westerville Defendants lacked a reasonable and articulable suspicion as to Austin.

Plaintiffs contend that because the *only* information implicating Austin in any crime was a "secondhand report of alleged anonymous tips," Austin's detention was unlawful under *Florida v. J.L.,* 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000). This argument fails for several reasons. In *Florida v. J.L.,* the Supreme Court held that an uncorroborated anonymous tip with no independent indicia of reliability could not serve as the basis for a stop and frisk. As a threshold matter, the information here was something more than a mere anonymous tip. While the customers might have remained anonymous to the police, Manson was not anonymous. As this case demonstrates, Manson was amenable to prosecution for making false statements to the police. Furthermore, the customers were not anonymous to Manson. While he might not have known their names, they came forward in person, causing their statements to be more reliable than the information received in an anonymous phone call to the police.

More significantly, each customer's complaint was corroborated by outside information. Each of the three complaints was corroborated by the other two, and there was no indication of any collaboration between the three separate tables of customers. Additionally, all the customer complaints were corroborated by Greber's

statement. Even though Greber's statement did not relate directly to Austin, the fact that Greber independently recognized Eisnnicher as a suspected bank robber lent credence to reports that Eisnnicher and Austin together had been discussing bank robberies. Taken as a whole, the information available to the Westerville Defendants at the time was sufficient to warrant an investigative stop of Austin.

### (3) Barbara Eisnnicher

With respect to Barbara Eisnnicher, the Westerville Defendants argue, first, that she was not detained and, second, that if she was detained, her detention was reasonable in order to secure the scene and protect both her safety and the officers' safety.

■■■■■ The Westerville Defendants' stop of Barbara Eisnnicher was a seizure that implicated the Fourth Amendment. She was detained for approximately the same amount of time as the other two Plaintiffs, though her detention was less onerous than theirs. "So long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual and no reasonable suspicion is required." *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (quoting *California v. Hodari D.*, 499 U.S. 621, 628, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991)). "[T]he crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Bostick* at 437, 111 S.Ct. 2382 (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988)); *see also Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ("It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person.").

Here, a reasonable jury could find that Barbara Eisnnicher was not "free to leave" at the time of the alleged detention. *Chesternut*, 486 U.S. at 573, 108 S.Ct. 1975. In *United States v. Drayton*, 536 U.S. 194, 204, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002), in finding a particular encounter to have been consensual, the Court noted, "[t]here was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice." Several of these elements existed here, however. In particular, there was an overwhelming show of force, as six police cruisers converged on Plaintiffs' vehicle and several officers emerged, with weapons drawn and shouting orders. Weapons were brandished, and commands were authoritatively and loudly issued. Mrs. Eisnnicher was ordered to put her hands up, to move to a specific location and stay there, and to "shut up." A reasonable person in her position would not have felt free to disobey, to leave, or to disregard the police and go about her business.

Furthermore, several of the police officers have testified that Barbara Eisnnicher was not free to leave during the encounter. For example, Officer Martz testified as follows:

Q. At this time, were any of the three occupants of the car free to walk away if they wished?

A. No.

Q. All three of them were being detained?

A. Yes.

Q. Is this what you would call a Terry stop?

A. Yes.

Q. In other words, an investigative detention?

A. Yes.

. . . . .

Q. What happened to her when she got out of the car?

A. I told her to stay where she was. And then later Detective Hunter told her to get by a tree, and that's where she stayed.

. . . . .

Q. She certainly was not free to leave at that time, was she?

A. Correct.

Similarly, Officer Coe testified as follows:

Q. Were any of these people free to leave at the time that the car was pulled over?

A. It's in detention, no . . .

. . . . .

Q. From the moment when the car was pulled over, until she was told she was free to leave, during that period of time. And I think your answer was yes, she was being detained during that period of time, correct?

A. Yes, she was being detained.

Officer Nightingale agreed:

Q. In other words, all three of these people were detained for the same amount of time, and they were released at the same time; is that what you're saying?

A. Correct.

If even the officers believed that Barbara Eisnnicher was detained, then surely a reasonable person in her place would not have felt free to go about her business.

■ The more significant issue here is whether the detention of Mrs. Eisnnicher was reasonable under the circumstances. The Court finds that Plaintiffs have creat-ed a genuine issue as to whether the seizure of Mrs. Eisnnicher was permissible under the Fourth Amendment. The Westerville Defendants admittedly had no particularized "reasonable suspicion" as to Barbara Eisnnicher that would warrant her seizure. *See U.S. v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). Officer Coe testified that Barbara Eisnnicher was detained solely because she was in the company of two suspected criminals:

Q. Are you aware of any reasonable articulable suspicion for detaining Mrs. Eisnnicher?

A. Other than if she's with them and we don't know what they're involved in, and she's with them and perhaps she's involved in what they're involved with.

We weren't told there was a woman with them at first. . . . She could be an associate of theirs. We need to determine that.

Q. This is all possibilities though, correct? You didn't have any evidence that any of that was true, did you? . . . .

A. Correct, nobody had told us about her.

Q. So the only reason that you detained her was she was found present with the other two guys, right?

A. She was an associate, she was with them at that time.

Officer Martz testified similarly:

Q. What reasonable articulable suspicion did you have to detain Mrs. Eisnnicher?

A. She was with the other two and . . . we were still trying to sort out the details and we needed to ask her some questions.

Q. And what reasonable, articulable suspicion did you have that she was involved in criminal activity?

A. She was with the other two and—

Q. That was really it, wasn't it?

A. Yes.

. . . . .

Q. So it was nothing more than the fact that she happened to be in the car with the two subjects of your investigation, right?

A. Correct.

Even absent particularized reasonable suspicion, however, courts have held that, where necessary to secure the scene of a valid search or arrest and ensure the safety of officers and others, "innocent bystanders" may be temporarily detained. *See, e.g., Michigan v. Summers,* 452 U.S. 692, 704–05, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981) (detention of resident of home being searched for contraband pursuant to valid warrant); *Burchett v. Kiefer,* 310 F.3d 937, 943–44 (6th Cir.2002) (detention of individual who approaches home being searched pursuant to valid warrant, then flees when police order him to "get down"); *United States v. Bohannon,* 225 F.3d 615, 616 (6th Cir.2000) (detention of individuals who arrive at scene of search pursuant to valid warrant); *United States v. Fountain,* 2 F.3d 656, 663 (6th Cir.1993), *overruled on other grounds, Trepel v. Roadway Express, Inc.,* 194 F.3d 708, 717 (6th Cir. 1999) (detention of nonresidents present at home when police arrive to search pursuant to valid warrant); *Willowby v. City of Phila.,* 946 F.Supp. 369, 373–74 (E.D.Pa. 1996) (order to "get down" directed to bystanders on porch when adjacent house being searched pursuant to valid warrant); *Thompson v. City of Lawrence,* Civil Action No. 93–2253–KHV, 1994 WL 262598, **10–11, 1994 U.S. Dist. LEXIS 7390, at *35–37 (D.Kan. May 19, 1994) (detention of innocent bystanders for a reasonable period of time where necessary to secure the scene of a valid arrest of suspected felon when police have reasonable belief that firearms may be involved).

The common thread in all of these cases is a "justifiable fear of personal safety." *Ingram v. City of Columbus,* 185 F.3d 579, 591–92 (6th Cir.1999); *see also Baker v. Monroe Township,* 50 F.3d 1186, 1191 (3d Cir.1995) (justifying a *Terry* stop of individuals in close proximity to a house about to be searched for drugs based upon safety concerns for the officers and bystanders). In *Thompson,* the cited case most analogous to this one, police had handcuffed and ordered to the ground an innocent bystander who happened to be present on an unrelated matter at a bondsman's office at the time that the office was raided and the bondsman arrested. In granting summary judgment to the defendants based on the strong police interest in securing the arrest scene, the court emphasized that the detention was permissible based on the uncontroverted fact that the police reasonably believed that the suspected felon they were arresting was armed. Defendants here, however, have not foreclosed the possibility that a jury accepting all inferences favorable to Plaintiffs could find that the police were unreasonable in their belief of the dangerousness of the situation. The only evidence the Westerville Defendants had that Plaintiffs were armed was an inference that people who have committed bank robberies and are wanted by the police are often armed and dangerous. This evidence is not nearly as strong as that in *Thompson,* where police had knowledge of the particular arrestee's reputation for keeping firearms in his office, where he was arrested. It is possible that a jury here could find that the police were not reasonable in their determination that the

detention of Mrs. Eisnnicher was necessary for officer and bystander safety.

Based on the foregoing analysis, the Westerville Defendants' Summary Judgment Motion is **GRANTED** as to the reasonableness of the detentions of Joseph Eisnnicher and Matt Austin. Plaintiff Barbara Eisnnicher, on the other hand, has created a genuine issue of material fact as to whether her detention was reasonable under the circumstances.

### b. Reasonableness of the Amount of Force Used

■■■ If a detention is legal, the police are still constrained from using any more force than is reasonable to effectuate the seizure. The Fourth Amendment requires that an officer's use of force be objectively reasonable, and courts must balance the consequences to the individual against the government's interests in effecting the seizure. *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). "This standard contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir.2002) (citation omitted); *see also Graham* at 396, 109 S.Ct. 1865 ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.") (citing *Terry v. Ohio*, 392 U.S. 1, 20–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Courts evaluating the reasonableness of force used "should pay particular attention to 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Darrah v. City of Oak Park*, 255 F.3d 301, 307 (6th Cir.2001) (quoting *Graham*, 490 U.S.

at 396, 109 S.Ct. 1865). Allowances must be made "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham* at 396–97, 109 S.Ct. 1865; *see Pray v. City of Sandusky*, 49 F.3d 1154, 1159 (6th Cir.1995) (noting that police officers are "regularly forced to make critical decisions under extreme pressure") (citation omitted).

■■■ The first question is whether it was reasonable for police to use the "felony take down" procedure and to perform pat down searches of Joseph Eisnnicher and Matt Austin. The Westerville Defendants had absolutely no evidence at any time that Eisnnicher and Austin were armed. The Westerville Defendants merely inferred that because Joseph Eisnnicher was suspected of being a wanted felon, both men were likely to be armed while going out to Bob Evans for breakfast. This inference, however, is just that—an inference that the jury could choose to accept or reject. On summary judgment, this Court is explicitly required to view all inferences in the light most favorable to the plaintiffs. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Here, a reasonable jury could choose to reject the inference that any wanted bank robber is likely always to be armed.

■■■ While the crime purportedly at issue was undeniably serious, there was never any evidence of an immediate threat to the safety of officers, and Eisnnicher and Austin made no attempts to resist arrest, following every instruction given by police promptly and without complaint. *See Darrah*, 255 F.3d at 307. Police noticed no suspicious bulges or sudden movements that would suggest a danger from concealed firearms. As *Terry, Graham,*

and *Darrah* all suggest, the severity of a suspected crime alone is not sufficient to warrant an intrusive stop that includes a pat down for weapons. *Terry* wisely distinguished between the suspicion, based on possible involvement in a crime, required to justify a stop and the suspicion, based on specific evidence of an immediate danger to the officer, required to justify a frisk for weapons. *Terry* expressly rejected the idea that mere suspicion of criminal activity could suffice to justify a search for a weapon. *Terry*, 392 U.S. at 27, 88 S.Ct. 1868; *see also Graham*, 490 U.S. at 396, 109 S.Ct. 1865 (listing severity of the crime at issue as merely one factor to consider in determining whether the amount of force used was excessive); *Darrah*, 255 F.3d at 307 (same). Here, it is undisputed that there was no specific evidence that Plaintiffs were armed. Under these circumstances, a reasonable jury could find the amount of force used to have been excessive.

 The second question is whether the amount of force used against Barbara Eisnnicher was excessive. A reasonable jury could find that Mrs. Eisnnicher's detention was longer than necessary to achieve the purpose of securing the scene. As noted above, various police officers have admitted that Mrs. Eisnnicher was detained for the same amount of time as the two men. Since she was never questioned for nor suspected of having committed any crime, her detention could only be justified by the need to assure the safety of officers and others. Any detention that was longer than necessary to achieve these goals would violate the Fourth Amendment. *See, e.g., Ingram v. City of Columbus*, 185 F.3d 579, 592 (6th Cir.1999) (noting the significance of the fact that the innocent bystanders had been handcuffed *after* police had located their true suspect and "presumably no longer needed to 'se-cure' the area as they searched for their suspect"); *Pray v. City of Sandusky*, 49 F.3d 1154, 1160 (6th Cir.1995) (finding a genuine issue of material fact as to "which, if any, of the illegal searches and seizures took place *after* the officers discovered or reasonably should have discovered that they were in fact in the wrong residence") (emphasis in original); *Willowby v. City of Phila.*, 946 F.Supp. 369, 375 (E.D.Pa.1996) (holding that "the length of the detention became unreasonable when the officers had control of the circumstances yet continued to detain the plaintiffs and other bystanders for reasons other than safety and identification"); *Thompson v. City of Lawrence*, Civil Action No. 93–2253–KHV, 1994 WL 262598, *10, 1994 U.S. Dist. LEXIS 7390, at *36 (D.Kan. May 19, 1994) (validating detention of innocent bystander "for a reasonable period of time where necessary to secure the scene of a valid arrest"); *see also Terry*, 392 U.S. at 19, 88 S.Ct. 1868 (noting that the scope of a search "must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible") (citations omitted). Even the Westerville Defendants' counsel, at oral argument, conceded that in the course of a "bystander stop" pursuant to *Summers*, the police are required to release the bystander once the scene is secured.

The need to detain Mrs. Eisnnicher to secure the scene could well have dissipated once the two men were handcuffed, once the two men were secured in the back seats of separate cruisers, or possibly even earlier. Joseph Eisnnicher and Matt Austin cooperated with the police from the commencement of the stop; they immediately complied with all instructions, and a reasonable jury could find that, at some point, the police had full control of the situation. Once the police had full control of the scene of the stop, there was no longer any justification to detain Mrs.

Eisnnicher. Any detention past this point would constitute a Fourth Amendment violation. There are thus two issues of material fact for the jury: (1) at what point, if any, the police gained full control of the situation such that the need to detain Mrs. Eisnnicher evaporated; and (2) for how long, if at all, after that point the police continued to detain Mrs. Eisnnicher.

Plaintiffs Joseph Eisnnicher and Matt Austin thus have established genuine issues of material fact as to whether the amount of force used violated the Fourth Amendment, and Plaintiff Barbara Eisnnicher has established a genuine issue of material fact as to whether the length of her detention violated the Fourth Amendment.

### 2. Qualified Immunity

According to the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (citations omitted). Qualified immunity involves a two-step inquiry. First, the court must determine whether the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation occurred. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If the court finds a constitutional violation, it then must consider whether the violation involves "clearly established constitutional rights of which a reasonable person would have known." *Christophel v. Kukulinsky*, 61 F.3d 479, 484 (6th Cir.1995) (citation omitted); *see Saucier*, 533 U.S. at 201, 121 S.Ct. 2151 (stating that the second inquiry is "whether the law clearly established that the officer's conduct was unlawful in

the circumstances of the case"); *see also Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.").

In determining whether a right is "clearly established," the court must consider the issue "in light of the specific context of the case" rather than as "a broad general proposition." *Saucier* at 201, 121 S.Ct. 2151. In other words, the inquiry in a case such as this is not whether a reasonable police officer would have been aware that unreasonable seizures violated the Fourth Amendment, but whether it would be clear to him that his conduct constituted an unreasonable seizure in the situation he confronted. *Saucier* at 201–02, 121 S.Ct. 2151; *see also Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (noting that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law"); *Priester v. City of Riviera Beach*, 208 F.3d 919, 926–27 (11th Cir. 2000) (stating that qualified immunity operates to protect officers from the sometimes "hazy border between excessive and acceptable force"). So long as an officer's belief in the legality of his actions is reasonable, he will be entitled to qualified immunity, even if that belief is mistaken. *Saucier* at 206, 121 S.Ct. 2151.

On a government official defendant's motion for summary judgment, the issue of whether there has been a constitutional violation is to be determined taking all facts in the light most favorable to the plaintiffs. *Pray v. City of Sandusky*, 49 F.3d 1154, 1158 (6th Cir.1995). The defendant is required to show that no genuine issues of material fact remain that would defeat his claim of qualified immunity. *Id.* The plaintiff, however, carries the

burden to allege and prove that the defendant official violated a clearly established right of which a reasonable person would have known. *Adams v. Metiva,* 31 F.3d 375, 386 (6th Cir.1994). "Thus, when a defendant moves for summary judgment based on qualified immunity, the plaintiff must: 1) identify a clearly established right alleged to have been violated; and 2) establish that a reasonable officer in the defendant's position should have known that the conduct at issue was undertaken in violation of that right." *Pray,* 49 F.3d at 1158 (citations omitted).

■ Constitutional violations have been established, at least for summary judgment purposes, based on the reasonableness and length of Barbara Eisnnicher's detention by Defendants and based on the amount of force used in the detention of the other two Plaintiffs. The next inquiry is whether the rights implicated in these three constitutional violations were clearly established, such that a reasonable officer would have realized the police conduct violated these rights. "A right is clearly established if there is binding precedent from the Supreme Court, the Sixth Circuit, or the district court itself, or case law from other circuits which is directly on point." *Barrett v. Harrington,* 130 F.3d 246, 264 (6th Cir.1997) (internal citations omitted); *see also Saucier,* 533 U.S. at 209, 121 S.Ct. 2151 (noting the absence of "any case demonstrating a clearly established rule prohibiting the officer from acting as he did").

■ The Westerville Defendants are entitled to qualified immunity as to the reasonableness of Barbara Eisnnicher's stop and as to the reasonableness of the amount of force used to effectuate the seizures of the other two Plaintiffs. The constitutional violations in both these instances are premised on a potential question regarding the reasonableness of Defendants' belief that Joseph Eisnnicher and Matt Austin were armed and dangerous. As the Court noted, a reasonable jury could find that this belief in Plaintiffs' dangerousness was unwarranted and, therefore, Defendants violated the Fourth Amendment both by detaining Barbara Eisnnicher in order to secure the scene and by conducting a full "felony takedown" procedure, complete with a pat down for weapons, as part of the seizure of Joseph Eisnnicher and Matt Austin.

Just because, however, a reasonable jury using hindsight could conceivably find a constitutional violation does not mean that the Westerville Defendants were unreasonable, at the time, in believing that their actions were permissible and warranted. As noted in *Malley,* qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley,* 475 U.S. at 341, 106 S.Ct. 1092. Plaintiffs have not established, as to these two potential Fourth Amendment violations, that there was any knowing violation of the law by the Westerville Defendants. The Court is not aware of any case law, and Plaintiffs have not come forward with any, that would clearly establish that police officers are not entitled to assume that people suspected of being bank robbers are armed and dangerous. In fact, part of the justification behind the doctrine of qualified immunity is to allow police officers wide latitude in determining whether a given situation is dangerous and what steps need to be taken to protect the officers' safety. *See, e.g., Pray,* 49 F.3d at 1160 ("[W]e recognize the need to allow some latitude for honest mistakes that are made by officers in such dangerous and difficult situations.") (citation omitted).

■ As for the length of Barbara Eisnnicher's detention, on the other hand, a reasonable officer in Defendants' position would have known that Mrs. Eisnnicher

could no longer constitutionally be detained once the danger had passed. *Ingram v. City of Columbus,* 185 F.3d 579, 592 (6th Cir.1999), and *Pray v. City of Sandusky,* 49 F.3d 1154, 1160 (6th Cir. 1995), if nothing else, are sufficient to alert an officer of reasonable competence that a person detained either by mistake or in order to secure the scene of an otherwise lawful stop may not be detained any longer than necessary to effectuate the purpose of the detention. Both of those cases and the other cases cited above are sufficiently on point that Mrs. Eisnnicher's right not to have her detention last any longer than necessary to secure the scene was clearly established.

Based on the foregoing qualified immunity analysis, the Westerville Defendants' Motion for Summary Judgment is **GRANTED** as to Plaintiffs' claims related to the amount of force used to effectuate the seizure of Joseph Eisnnicher and Matt Austin and to the fact of Barbara Eisnnicher's seizure. The Westerville Defendants are not, however, entitled to qualified immunity as to the length of Barbara Eisnnicher's detention, and their Motion is accordingly **DENIED** as to that claim.

### B. Barbara Eisnnicher's Motion

Since Barbara Eisnnicher does not succeed on the Westerville Defendants' Summary Judgment Motion as to the reasonableness of her detention, then, *a fortiori,* she must fail on her Motion for Partial Summary Judgment as to that claim. Since she survives summary judgment regarding the length of her detention, however, the Court must still consider whether she is entitled to summary judgment against the Westerville Defendants as to the validity of that claim.

▬ Taking all inferences in the light most favorable to Defendants, as the Court is required to do for purposes of this Motion, the Court finds that the Westerville Defendants have created a genuine issue of material fact as to whether the situation remained sufficiently dangerous to justify the detention of Mrs. Eisnnicher for the entire 15 to 17 minute period that the other Plaintiffs were detained. A reasonable jury could find that the situation was sufficiently confusing and dangerous that the police were warranted in exercising caution by continuing to detain Mrs. Eisnnicher until the two men were cleared. Plaintiff Barbara Eisnnicher's Motion for Partial Summary Judgment is therefore **DENIED.**

### C. The Bob Evans Defendants' Motion

As clarified by their Memorandum Contra, Plaintiffs' claims against the Bob Evans Defendants are all under Ohio tort law, namely: (1) false arrest and imprisonment; (2) defamation; and (3) negligence. Each of these claims will be addressed *seriatim.*

#### 1. *False Arrest and Imprisonment*

The Bob Evans Defendants argue that they are entitled to summary judgment on Plaintiffs' false arrest claims because all of the Defendants Bob Evans, Manson, and the Westerville Defendants—acted reasonably under the circumstances, such that Plaintiffs cannot establish that they were deprived of their liberty *without justification.* The Bob Evans Defendants also argue that summary judgment is warranted because they neither effected the arrest nor took an "active role" in the Westerville Police Department's ("WPD") detainment of Plaintiffs. Plaintiffs, in response, concede that the Bob Evans Defendants did not procure their arrest but argue that Defendants are nonetheless liable under Ohio law because they supplied the WPD with false information which was the basis for Plaintiffs' arrest. Defendants contend that even if Defendant Manson might be

liable to Plaintiffs, Defendant Bob Evans, under the doctrine of respondeat superior, may not be liable for Manson's tortious conduct.

### a. Natterious Manson

 A claim for false arrest[2] requires a showing that the plaintiff was detained without lawful justification. *Harvey v. Horn*, 33 Ohio App.3d 24, 514 N.E.2d 452, 454 (1986). It does not require proof of malice, motive, or lack of probable cause. *Tucker v. Kroger Co.*, 133 Ohio App.3d 140, 726 N.E.2d 1111, 1115 (1999). "Where a private citizen merely summons an officer for assistance because of a disturbance and does not specifically request that the person be arrested nor supply the false information to the police which causes the arrest, the citizen is not liable." *White v. Standard Oil Co.*, 16

Ohio App.3d 21, 474 N.E.2d 366, 367 (1984). Most of the legal arguments of the parties relating to the false arrest claim center around whether Defendant Manson requested or otherwise procured Plaintiffs' arrest. *Cf. White*, 474 N.E.2d at 367–68 (noting that the procurement of false imprisonment is the equivalent in words or conduct to "Officer, arrest that man!"). Indeed, most of the available case law focuses on this issue as well.

 It appears from *White*, however, that there are actually two paths to liability for the tort of false arrest: a private citizen can be liable either for having specifically requested the police to arrest someone or for having intentionally provided false information to the police that leads to that person's arrest.[3] *White*, 474 N.E.2d at 367; *see also Thomas v. Bank*

---

**2.** The Court acknowledges that Plaintiffs' claim, as stated in the Complaint, is one for "false arrest and imprisonment." The Court, however, is employing the shorthand of "false arrest" because the two claims require proof of essentially the same elements. *See, e.g., Rogers v. Barbera*, 170 Ohio St. 241, 164 N.E.2d 162, 164 (1960) ("[F]alse arrest and false imprisonment as causes of action are indistinguishable."); *Walker v. Kroger's*, 1994 WL 159764, at *2 (Ohio Ct.App. Apr. 29, 1994) (unreported) ("Claims of false arrest and false imprisonment are oftentimes confused. A false imprisonment will necessarily follow a false arrest, but a false arrest need not precede a false imprisonment. However, the elements of each claim are basically the same.").

**3.** Defendants cite to an unreported case that holds that a cause of action for false arrest may only be brought against the persons actually making the arrest or their employers. *See Hamilton v. Best Buy*, No. 19001, 2002 WL 242542, at *2 (Ohio Ct.App. Feb.15, 2002) (citing *Walker v. Kroger's*, No. L–93–162, 1994 WL 159764 (Ohio Ct.App. Apr. 29, 1994), which, as far as the Court can tell, does not make such a holding). The Court believes that this isolated holding is not congruous to other Ohio case law and thus should not be followed here.

Defendants also rely on *Walker*, also an unreported case, which held that a store employee and her employer could not be liable for false arrest, even if they knew that the facts underlying the criminal complaint they provided to police were not true. *Walker*, 1994 WL 159764, at *2. The *Walker* decision was based on the fact that the arrest at issue was made pursuant to a valid warrant so was therefore lawful. *Id.* (noting that as long as there is a bona fide attempt to charge an offense in the complaint which underlies the arrest warrant, the warrant is not void and may thus serve as a complete defense to the tort of false arrest).

*Walker* is distinguishable from this case because of the warrant involved. The processes and procedural safeguards attendant to the issuance of a warrant guard against the very thing that allegedly took place here—a hasty detainment, unwarranted in hindsight, based on allegedly false information. The *Walker* court concluded that the proper claim where an arrest was based on a valid warrant but where that warrant was based on false charges would be a claim for malicious prosecution. Since this case did not involve a warrant and its attendant safeguards, including the possibility of a malicious prosecution claim, the only remedy available to Plaintiffs is in the tort of false arrest.

One, Cleveland, N.A., No. 90–L–15–164, 1991 WL 279445, at *2 (Ohio Ct.App. Dec. 31, 1991) (finding no liability where defendants had neither (1) summoned police to report a crime; (2) provided false information; nor (3) requested the plaintiff's arrest); *Hawkins v. McDonald's Rests. of Ohio, Inc.*, No. 11369, 1989 WL 109296, at *2 (Ohio Ct.App. Sept.21, 1989) ("Where a private citizen knowingly gives a police officer false information which is a determining factor in the officer's determination to arrest[,] the private citizen may be liable for false arrest and imprisonment."); *Beverly v. Lawson Co.*, No. 45119, 1983 WL 4607, at *4 (Ohio App. Aug. 18, 1983) ("Where a private citizen neither conveys false information to an officer nor specifically requests that the officer arrest a person who allegedly committed a disturbance or trespass, the courts have held that the private citizen is not liable for false arrest or imprisonment."). *Hawkins*, in fact, explicitly distinguishes between a situation where a private citizen gives a police officer false information and a situation where a citizen "merely reports to a police officer what he has seen and heard." *Hawkins*, 1989 WL 109296, at *2; *see also Beverly*, 1983 WL 4607, at *4 (assuming

defendant's employee acted in good faith before considering whether employee requested that police arrest plaintiffs). It is only in the latter situation, where the arrest can then be seen as an act of the officers rather than of the citizen, that the citizen is immunized from liability. *Hawkins*, 1989 WL 109296, at *2. Here, the allegation is that Manson intentionally provided the police with false information that directly led to Plaintiffs' *Terry* stop.[4]

The first question in this analysis is whether Plaintiffs have come forward with sufficient evidence to support a jury finding that Manson intentionally provided the police with false information about Plaintiffs. Plaintiffs have presented evidence sufficient to create a genuine issue as to whether Manson lied about his encounters with the three groups of customers in the interest of saving his job. A reasonable jury, based on this evidence, could believe the following scenario expounded by Plaintiffs.[5]

After pressing the alarm button, Plaintiffs contend, Manson began to be concerned that he might lose his job for having called in a false police emergency. He

---

**4.** Even if the intentional provision of false information to the police were not enough to subject a private citizen to liability for false arrest, a reasonable jury could still conclude that Manson indirectly procured Plaintiffs' arrest. *See, e.g., Van Hull v. Marriott Courtyard*, 87 F.Supp.2d 771, 776 (N.D.Ohio 2000) ("Whether a civilian's instigation is sufficient to expose it to liability for a wrongful arrest made by an officer depends on the facts of each case."); *Niessel v. Meijer, Inc.*, No. CA2001–04–027, 2001 WL 1598325, at *8 (Ohio Ct.App. Dec. 17, 2001) (finding a genuine issue of material fact as to whether store's call to police amounted to a request to apprehend suspected shoplifter); *Cox v. Kobacker Stores, Inc.*, Case No. 85CA2, 1985 WL 8081, at *2 (Ohio Ct.App. Aug.30, 1985) (denying summary judgment where a reasonable inference could be drawn that the defendant *"intended* the police to apprehend" the plaintiff)

(emphasis added); *Mitles v. Young*, 59 Ohio App.2d 287, 394 N.E.2d 335, 338 (1978) (finding that private citizens had instigated the plaintiff's arrest by "point[ing] the finger of crime" at him); *see also, e.g., White v. Standard Oil Co.*, 16 Ohio App.3d 21, 474 N.E.2d 366, 367 (1984) (finding no liability for private citizen when decision to arrest was entirely the decision of police officers who witnessed a crime being committed in their presence).

**5.** Defendants argue that Plaintiffs' version of the facts is impermissibly based on inadmissible hearsay. The Court believes, however, that Plaintiffs have created a genuine issue as to Manson's credibility even absent any of the inadmissible hearsay evidence contained in their Memorandum.

had been the subject of several prior disciplinary incidents, and he told his co-manager that he thought he was going to lose his job for having called the Westerville police. In order to cover himself, Manson invented the story of the interactions with the three groups of customers to bolster Greber's statement and create a post hoc justification for having activated the alarm. Inconsistencies between the story that Manson gave at various times and between Officer Martz's version of what Manson told police and Manson's version of what he told police support this scenario.

For example, Officer Martz testified at deposition that Manson told her that at least six customers, sitting at three separate tables scattered throughout the restaurant told him that they had overheard conversations in the waiting area in which Plaintiffs were discussing "doing bank robberies . . . and how they've done previous bank robberies and they were going to be staking out a place to do another bank robbery, and that they had been running from the police and like bragging that they hadn't been caught." According to Officer Martz, Manson told her that all of the customers had left by the time the police arrived. Manson, on the other hand, states that nine different customers, seated at three tables in a row near Plaintiffs' table, told him that they had overheard conversations while they and Plaintiffs were seated at their tables in which Plaintiffs were talking about "bank robberies," "running from the police," and "jobs." Manson denies having told Officer Martz that these customers had left the restaurant. Later on the day of the incident, Manson told his boss, Jamie Myers–Huff, that several customers had told him that people were "talking about robbing the restaurant."

Furthermore, Manson has no extrinsic evidence to support his story, and, in fact, extrinsic circumstantial evidence tends to suggest that Manson's story is not credible. Out of at least 18 other restaurant staff on duty, no one saw any customers contact Manson and no one noticed any customers leaving the restaurant after having ordered and before being served, in the five minutes between when they spoke to Manson and when the police arrived. The fact that all three groups of customers chose to speak with Manson rather than with any of the other 18 staff members, including one other manager, also creates an inference of implausibility. Similarly, a jury could find the fact that Manson is unable to provide physical descriptions of any of these customers to be suspicious. Finally, the fact that Plaintiffs obviously were not bank robbers who were not discussing the things supposedly overheard by the customers militates in Plaintiffs' favor, especially when considered with the fact that the stories allegedly told by the three separate groups of customers were suspiciously similar to each other.

■■■ The Bob Evans Defendants contend that Plaintiffs have offered only speculation and conjecture to create an issue of fact. The Court disagrees. On summary judgment, courts are required to construe all facts and inferences in favor of the non-moving party on summary judgment, and this includes resolving all questions of credibility in plaintiff's favor. *See Dupler v. Mansfield Journal Co.,* 64 Ohio St.2d 116, 413 N.E.2d 1187, 1192 (1980) (stating, in regard to summary judgment motions, that, "a trial court may not weigh the proof or choose among reasonable inferences. In ruling on such a motion, the court is limited to examining the evidence 'taking all permissible inferences *and resolving questions of credibility in plaintiff's favor.* . . .' ") (citation omitted) (emphasis added). A trier of fact could credit the above inconsistencies and implausibilities, reasonably

decide not to believe Manson's testimony, and reach the conclusion that Manson acted in bad faith in inventing a story for the police that would lead to Plaintiffs' detention.

The next inquiry is whether Manson's statements to the police led to, or were a determinative factor in causing, the police detention of Plaintiffs. Even though Greber's statements were unquestionably a factor in causing Plaintiffs' detention, a reasonable jury viewing all inferences in the light most favorable to Plaintiffs could determine that Manson's statements also were a determinative factor.

Defendants' Motion for Summary Judgment is therefore **DENIED** as to Plaintiffs' false arrest and imprisonment claims against Defendant Manson.

### b. Bob Evans

The remaining question is whether Bob Evans may be liable for false arrest, under the doctrine of respondeat superior, based on the actions of its employees. For an employer to be vicariously liable under the doctrine of respondeat superior, the tort committed by the employee must be committed within the scope of employment, and where the tort is intentional, "the behavior giving rise to the tort must be 'calculated to facilitate or promote the business for which the servant was employed.'" *Byrd v. Faber*, 57 Ohio St.3d 56, 565 N.E.2d 584, 587 (1991) (citations omitted). "[A]n employer is not liable for independent self-serving acts of his employees which in no way facilitate or promote his business." *Id.* at 588; *see also Thomas v. Ohio Dep't of Rehab. & Corr.*, 48 Ohio App.3d 86, 548 N.E.2d 991, 994 (1988) (noting that liability should attach to employer where tortious conduct "was actuated, at least in part, by the purpose to serve the master and in furtherance of [the master's] business"). The issue of whether an employee is acting within the scope of his employment ordinarily is a question of fact to be decided by the jury. *Osborne v. Lyles*, 63 Ohio St.3d 326, 587 N.E.2d 825, 829 (1992). The scope of employment issue becomes a question of law only when reasonable minds can come to but one conclusion. *Id.*

Plaintiffs would have the Court analogize this case to the case of a bouncer who uses more force than authorized, or to *Thomas*, 48 Ohio App.3d 86, 548 N.E.2d 991, where a prison guard used force that the prison determined was unjustified. In those cases, the employee can be seen as working in furtherance of the employer's purpose, but fulfilling that purpose more zealously than the employer might desire. Imposition of liability on the employer in such cases is justified by the policy objectives underlying respondeat superior liability. These objectives are: "(1) to prevent recurrence of the tortious conduct; (2) to give greater assurance of compensation for the victim; and (3) to ensure that the victim's losses will be equitably borne by those who benefit from the enterprise that gave rise to the injury." *Osborne*, 587 N.E.2d at 830 (citation omitted). Indeed, all three objectives are implicated in the case of the bouncer or the prison guard. Courts impose liability on employers under those circumstances to encourage the employers who ultimately benefit from the overzealous performance of duty to restrain their employees.

No such policy objective would be served by imposing liability on Bob Evans based on Manson's tortious actions. This case is distinguishable from *Thomas*, or from the case of an overzealous bouncer, because Manson was not serving the employer's purpose when he performed the act in question. The tortious act here was not calling the police, which was certainly within the scope of Manson's employment, but rather telling a lie to the police. The

purpose of this lie was purely personal—to keep Manson from losing his job. Bob Evans did not benefit from Manson's alleged lie to the police. Furthermore, imposing liability on Bob Evans would not serve to prevent recurrences of the tortious conduct, as this Court can think of nothing that Bob Evans could or should do that it is not already doing to prevent incidents such as this one from occurring. In short, reasonable minds can come to but one conclusion as to the purpose of Manson's allegedly tortious conduct. Its purpose was purely personal and did not benefit Bob Evans at all.

As to any responsibility by Bob Evans for the actions of Eric Greber, the initial question is whether Greber's statement to the police constituted deliberately false information that would serve as a basis for false arrest liability. The Bob Evans Defendants contend that Plaintiffs' claim of tortious conduct by Greber is based on inadmissible hearsay, specifically Greber's written retraction of his initial statement to the police. The Court need not consider whether Greber's written statement is hearsay because, even with that statement, Plaintiffs still have not established a genuine issue as to whether Greber's identification of Joseph Eisnnicher was a deliberate falsehood instead of merely a mistake. On first examination, Greber's mis-identification of Joseph Eisnnicher appears to have been a mistake. Plaintiffs have adduced no evidence to create a plausible suggestion that it was anything other than a mistake. Even Greber's statement that his initial identification was "false" is no more than an admission, since Joseph Eisnnicher had been discovered not to be the wanted bank robber from "Crime Stoppers," that Greber had been mistaken. Based on the evidence that Plaintiffs have put before the Court, no reasonable jury could find that

Greber's identification of Joseph Eisnnicher was anything other than a good faith mistake. Because Greber could not be liable to Plaintiffs for the tort of false arrest, Bob Evans is not subject to respondeat superior liability based on Greber's conduct.

Based on the foregoing, the Bob Evans Defendants' Motion for Summary Judgment is **GRANTED** as to Bob Evans' liability for false arrest and imprisonment.

### 2. Defamation

The Bob Evans Defendants argue that Plaintiffs' defamation claim fails as a matter of law because the statements made by Greber and Manson were not false and defamatory, and because neither employee acted with the required degree of fault. Defendants also contend that Plaintiffs have made no showing as to how their reputations allegedly were damaged; in fact, their detention was not reported in the news media and Plaintiffs have not averred that any of their friends or acquaintances ever even found out about it.

Under Ohio law, to establish a claim for defamation, a plaintiff must prove: (1) the defendant made a false statement of fact; (2) such statement was defamatory, or, in other words, "ruinous to his reputation"; (3) the statement was published; (4) the publication proximately caused the plaintiff to suffer injury; and (5) the defendant acted with the required degree of fault in publishing the statement. *Toledo Heart Surgeons, Inc. v. Toledo Hosp.*, 154 Ohio App.3d 694, 798 N.E.2d 694, 696–97 (2003); *see also State ex rel. Sellers v. Gerken*, 72 Ohio St.3d 115, 647 N.E.2d 807, 810 (1995) ("defamation generally requires falsity, defamation, publication, injury, and fault"). The injury required to state a defamation claim is injury to the plaintiff's reputation. *Ashcroft v. Mt. Sinai Med. Ctr.*, 68 Ohio App.3d 359, 588 N.E.2d 280, 283 (1990) (stating that, to

establish a defamation claim, plaintiffs must demonstrate "the existence of a false publication causing injury to a person's reputation, or exposing him to public hatred, contempt, ridicule, shame or disgrace, or affecting him adversely in his trade or business"). Indeed, "[t]he gravamen of the tort of defamation is whether or not the plaintiff has been lowered in the eyes of his fellowman." *Hersch v. E.W. Scripps Co.,* 3 Ohio App.3d 367, 445 N.E.2d 670, 678 n. 11 (1981) (citation omitted).

■ To survive summary judgment on any claim, the movants, here the Bob Evans Defendants, have the burden of establishing that there are no genuine issues of material fact. One way of accomplishing that task is to demonstrate that the nonmoving party lacks evidence to support *an essential element of its case. Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.,* 12 F.3d 1382, 1388–89 (6th Cir.1993). Defendants have done just that regarding Plaintiffs' defamation claim, since they have demonstrated that Plaintiffs have no evidence of injury caused by the alleged defamatory statements.

The only injury alleged by Plaintiffs is in their Complaint, wherein they state, "As a proximate result of the acts of the Defendants as alleged, Plaintiffs suffered and have continued to suffer physical pain and suffering, fear, loss of liberty, mental and emotional anguish, embarrassment, expense and inconvenience." That allegation, however, is insufficient to survive summary judgment. In responding to a motion for summary judgment, the nonmoving party *"may not rest upon its mere allegations ... but ... must set forth specific facts showing that there is a genuine issue for trial."* Fed.R.Civ.P. 56(e) (emphasis added); *see Celotex,* 477 U.S. at

324, 106 S.Ct. 2548; *Searcy v. City of Dayton,* 38 F.3d 282, 286 (6th Cir.1994). Because Plaintiffs have failed to set forth specific facts regarding the essential element of injury to their reputations, there is no genuine issue for trial on their defamation claim. Consequently, the Court **GRANTS** summary judgment to the Bob Evans Defendants on this claim.

### 3. Negligence

■ According to the Bob Evans Defendants, Plaintiffs similarly cannot survive summary judgment on their negligence claim because, *inter alia,* they have not established any injury. Defendants point out that the only "loss" alleged by Plaintiffs is a potential wage loss that Barbara Eisnnicher may have suffered from the one day she voluntarily skipped work following the incident. Because this was Plaintiff's choice, however, Defendants aver that they are not the proximate cause of her wage loss, as required to establish a claim for negligence.

■ To recover on a negligence claim, a plaintiff must establish that a breach of a duty proximately caused him injury. *City of Cincinnati v. Beretta U.S.A. Corp.,* 95 Ohio St.3d 416, 768 N.E.2d 1136, 1144 (2002). Once again, however, Plaintiffs have offered no evidence of any injury suffered by them due to Defendants' actions. Joseph Eisnnicher and Matt Austin admittedly suffered no economic loss or actionable emotional distress. Any wage loss suffered by Barbara Eisnnicher was not proximately caused by the Bob Evans Defendants, where she has failed to refute their allegation that she voluntarily chose to take a day off of work and only continued to take the Valium prescription that she previously had taken for a number of years prior to the incident. Plaintiffs, for example, could have provided the Court with an affidavit from Mrs. Eisnnicher's doctor about how she visited the doctor following the incident and suffered from

emotional stress, making it necessary that she continue taking her Valium and miss a day of work. Plaintiffs, however, did no such thing, and they cannot rest on mere allegations in defending against a motion for summary judgment.

The Bob Evans Defendants' Motion for Summary Judgment is therefore **GRANTED** as to Plaintiffs' negligence claim.

## VI. CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Westerville Defendants' Motion for Summary Judgment as to all claims except the claim related to the length of Barbara Eisnnicher's detention. The Motion is **DENIED** as to that claim. Plaintiff Barbara Eisnnicher's Motion for Partial Summary Judgment is **DENIED.** The Bob Evans Defendants' Motion for Summary Judgment is **DENIED** as to Plaintiffs' false arrest and imprisonment claims against Defendant Manson but **GRANTED** as to all other claims.

**IT IS SO ORDERED.**